*In re* MINNETONKA LAKE IMPROVEMENT.

HERBERT M. CARPENTER *et al. vs.* BOARD OF COUNTY COM'RS OF HEN-
NEPIN COUNTY.

Argued January 3, 1894. Reversed Feb. 10, 1894.

Nos. 8460, 8461.

| 56 | 513 |
| f73 | 89 |
| 73 | 90 |
| 73 | 133 |
| 73 | 134 |
| 74 | 419 |
| 56 | 513 |
| 83 | 465 |
| 83 | 467 |
| 56 | 513 |
| 84 | 473 |

High-water mark defined.

"High-water mark," as a line between the public and riparian owners on navigable waters, where there is no ebb and flow of the tide, is to be determined by examining the bed and banks, and ascertaining where the presence and action of the water are so common and usual as to mark upon the soil of the bed a character distinct from that of the banks in respect to vegetation as well as the nature of the soil.

Includes only land wrested from vegetation.

It is co-ordinate with the limit of the bed of the water, and that only is to be considered the bed which the water occupies so long and continuously as to wrest it from vegetation and destroy its value for agricultural purposes.

Does not include land only occasionally overflowed.

The bed does not include low lands which, although subject to frequent overflow, are valuable as meadows and pastures; and the state has no right, even in aid of navigation, to raise the water by artificial means, so as to injure or destroy such lands, without making compensation.

Assessment for special benefits.

To support a special assessment for a local improvement, the benefit for which the land is assessed must be secured.

Same invalid because special benefit not secured.

The assessment in this case *held* invalid, because no provision is made for compensating riparian owners for injuries to their lands caused by raising the waters of Lake Minnetonka, pursuant to the provisions of Sp. Laws 1891, ch. 381.

*Certiorari* issued August 3, 1893, by this court, on the relation of Herbert M. Carpenter, Reuben C. Benton and the Minneapolis Trust Company, to the District Court of Hennepin County, *Frederick Hooker*, J., to certify and return to this court the files, record and judgment in the matter of the proceedings of the Board of

County Commissioners of the County of Hennepin to establish and maintain a uniform stage of water in Lake Minnetonka, under Sp. Laws 1891, ch. 381.

The act authorizes the County Commissioners to establish a uniform height at which the waters shall be maintained, not above high water mark, and to acquire by purchase or condemnation the dam of the Minnetonka Mill Company near the outlet of the lake. When the amount required for the purchase or condemnation is ascertained the Commissioners are to apply to the District Court for the appointment of three assessors of benefits.  These assessors are to assess the amount upon the tracts and parcels of land in Hennepin County they deem to be specially benefitted; upon each piece or parcel a just proportion of the whole.  Persons interested are permitted to produce evidence and be heard.  When the assessment is completed it is to be filed in the court, and a time fixed for hearing and confirmation.  Notice thereof is to be served by publication.  The District Court is given power on the hearing to revise, correct and confirm the assessment.  After confirmation a copy is to be filed with the County Auditor and the sums assessed are made a lien on the lands and are to be included in the next general tax list and like proceedings had in all respects for their collection as is provided by law for the collection of state, county and city taxes.

Commissioners were appointed and the dam acquired.  The total cost of the property and the condemnation proceedings was $14,032. On April 16, 1892, assessors were appointed and they proceeded to assess the amount on the property in Hennepin County which they deemed specially benefitted.  On Carpenter's land they assessed $33, on Benton's land $10, and on the land of the Minneapolis Trust Company $800, and on other parcels various amounts aggregating the $14,032 and made report to the court.  Notice of hearing and for confirmation was given.  The relators appeared and filed objections and opposed confirmation, but were overruled and the assessment was confirmed.  At the hearing evidence was given and the whole was subsequently embodied in a case certified, signed and filed with the proceedings.  No provision is made by the statute for an appeal and the relators removed the record to this court by *certiorari*.

*Kellogg & Laybourn, Benton, Roberts & Brown* and *W. E. Dodge*, for relators.

Sp. Laws 1891, ch. 381, is unconstitutional and void, and does not authorize an assessment for benefits. The provision for maintaining the waters at an artificial level, without making compensation to riparian owners, invalidates the act and makes the assessment for benefits void.

The condemnation of the mill dam property cannot be valid unless it is for a public object. The only public object which is to be attained is the maintenance of an artificial stage of water in Lake Minnetonka. If that object cannot be carried out under the provisions of this act, then the object of the condemnation must necessarily fail, and with it the legality of the condemnation itself, with the result that the assessments which are levied to pay the award for the mill property must be declared invalid. *Foser* v. *Stafford Nat. Bank,* 57 Vt. 128; *Brooks* v. *Baltimore,* 48 Md. 265; *Macon* v. *Patty,* 57 Miss. 378; *In re Market Street,* 49 Cal. 546; *State* v. *Elizabeth,* 37 N. J. Law, 353; *Dalrymple* v. *City of Milwaukee,* 53 Wis. 178; *Guest* v. *City of Brooklyn,* 69 N. Y. 506; *Rogers* v. *City of St· Paul,* 22 Minn. 494.

The entire burden of paying for the benefits, if any, derived from this improvement is placed upon lands situated in Hennepin County, and the riparian and other lands situated in Carver County are especially exempted from these assessments though benefitted to an equal extent. *Le Duc* v. *City of Hastings,* 39 Minn. 110; *Stratton* v. *Collins,* 43 N. J. Law 562; *Mississippi Mills* v. *Cook,* 56 Miss· 40; *County of Santa Clara* v. *Southern Pac. R. Co.,* 18 Fed. Rep. 385; *Northern Pac. R. Co.* v. *Carland,* 5 Mont. 146; *Weeks* v. *Milwaukee,* 10 Wis. 242.

The artificial level adopted by the commissioners in this proceeding will have the effect of perpetually flowing the land of riparian owners above natural high water mark, to their injury, but no provision whatever for compensation is made for these injuries.

If by artificial means lands are subjected to a greater easement than they would be by the water in its natural stage and channel, as by maintaining the waters higher than the natural level, this is a taking of property for public use without making compensation.

*Weaver v. Mississippi & R. R. Boom Co.*, 28 Minn. 534; *Pumpelly v. Green Bay Co.*, 13 Wall. 166; *Eaton v. Boston &c. R. Co.*, 51 N. H. 504; *Ten Eyck v. Delaware & R. Canal Co.*, 18 N. J. Law 200; *Morris Canal & B. Co. v. Mayor of Jersey City*, 26 N. J. Eq. 294; *Union Depot St. Ry. & T. Co. v. Brunswick*, 31 Minn. 297; *Yates v. Milwaukee*, 10 Wall. 497; *Hanford v. St. Paul & D. R. Co.*, 43 Minn. 104.

The line below which the fee of the riparian owner can be said to be qualified in any sense of the word is the line of natural ordinary high water mark, and not the extreme high water mark which is reached by exceptional and extraordinary stages of the water. *Howard v. Ingersoll*, 13 How. 381; *Paine v. Woods*, 108 Mass. 160; *Stover v. Jack*, 60 Pa. St. 339; *Bradshaw v. Duluth Imp. Mill Co.*, 52 Minn. 59.

No prescriptive right of the mill owners to maintain the waters at the level adopted has been shown. *Polly v. McCall*, 37 Ala. 20; *Donnell v. Clark*, 19 Me. 174; *Chicago & N. W. Ry. Co. v. Hoag*, 90 Ill. 339; *Mertz v. Dorney*, 25 Pa. St. 519; *Barber v. Nye*, 65 N. Y. 211; *Carlisle v. Cooper*, 19 N. J. Eq. 256; *Gilford v. Lake Co.*, 52 N. H. 262.

*Frank M. Nye*, County Attorney, and *Carman N. Smith*, for respondents.

The State has the right, for the improvement of navigation, to maintain the water in a navigable lake at a height between high and low water marks without providing for compensation to riparian owners. The evidence shows that the height established by the commissioners under the law in question and designated as 220.91 above *datum* is between high and low water mark. During twelve years prior to these proceedings the water had been as high or higher than 220.91 for 35 out of 136 months. This clearly shows that the high water mark of the waters of the lake is at least as high as 220.91. The evidence as to the height of water prior to July, 1881, is not based on accurate measurements, but so far as secured it shows that high water mark previous to that date was 220.91. *Wisconsin River I. Co. v. Lyons*, 30 Wis. 61; *Gould v.*

*Hudson R. R. Co.*, 6 N. Y. 522; *Stevens* v. *Patterson & N. R. Co.*, 34 N. J. Law 532.

Within the banks and below high water mark the public right is supreme and damages to riparian proprietors are *damnum absque injuria*. *Black River I. Co.* v. *La Crosse B. & T. Co.*, 54 Wis. 659; *Hollister* v. *Union Wharf Co.*, 9 Conn. 436; *McKeen* v. *Delaware Div. Canal Co.*, 49 Pa. St. 424; *Arimond* v. *Green Bay & M. Canal Co.*, 31 Wis. 316; *Rice* v. *Ruddiman*, 10 Mich. 125. We admit that in case of actual taking the riparian owners are entitled to compensation. But in this case the state is merely asserting a right which it has always been entitled to and subject to which the riparian owners have always held their title.

A full discussion of the questions here involved is found in *Mills* v. *United States*, 46 Fed. Rep. 738.

It is undisputed that a dam was continuously maintained across the outlet of Lake Minnetonka at the point where the dam acquired by the commissioners in these proceedings is situated since 1853; that this dam was so maintained at a height above 220.91 and that the Minnetonka Mill Co. claimed the right to maintain the dam at that height and to flow all lands that would be flowed by maintaining a dam at that height. An easement of flowage was thus acquired by prescription. *Gilman* v. *Tilton*, 5 N. H. 231; *Budding-ton* v. *Bradley*, 10 Conn. 213; *Mueller* v. *Fruen*, 36 Minn. 273; *Burnham* v. *Kempton*, 44 N. H 78; *Kaukauna W. P. Co.* v. *Green Bay & McC. Co.*, 142 U. S. 254.

MITCHELL, J. Lake Minnetonka is a large, navigable body of water, situated mainly, but not wholly, in Hennepin county. The shores of the lake are in some places somewhat steep and abrupt, and in other places low and flat, and bounded by large tracts of low land, only slightly elevated above the ordinary level of the water in the lake. These lands form no part of the bed of the lake, but are more or less subject to periodical overflow at certain seasons of the year,—during some years in times of high water caused by rains or melting snows; but they are sufficiently dry, when the water subsides, to be susceptible of valuable use as pastures and meadows. The height of the water in the lake varies

in different years and at different seasons of the same year, according as the year or season of the year is wet or dry,—the difference between extreme high water and extreme low water, according to observations taken during a series of years, being something like six feet; extreme high water being 223.65, and extreme low water being 217.84, measured from an arbitrary base line. These changes in the height of the water are irregular, without fixed quantity or time, except that they occur periodically, according as the year or the season of the year is wet or dry. The rises of the water, to a sufficient height to overflow, in whole or in part, these low lands, are not infrequent, and are liable to occur any year, usually in the spring; but the water generally subsides later in the season, so as to render the lands capable of use as meadows and pastures. The outlet of the lake is Minnehaha creek, the real point of outlet being about four miles below the main body of the lake. About a mile below this point there was a mill and milldam, which had been maintained for over 20 years. The object of this dam was, apparently, to enable the owners of the mill to use the lake as a mill pond, in which to store the waters of the lake at certain seasons of the year, and draw them off at others, as required for the use of the mill.

In 1891 the legislature passed an act (Sp. Laws 1891, ch. 381) which, after reciting that it was necessary "for the improvement of navigation, preservation of public health and for public advantage, benefit and use," that the waters of the lake should be maintained at a uniform height, sufficient to secure these purposes, authorized the board of county commissioners of Hennepin county to establish and maintain a uniform height of the water, "not to be above extreme high water mark of the waters of said lake." In order to carry out the purposes of the act, the board was authorized to acquire, by gift, purchase, or condemnation, the dam already referred to, together with all the rights and easements connected with or appurtenant to the same, and the land on which the dam was situated, and such other lands adjacent thereto as might be necessary to enable the board to maintain said waters at the height so established. As will be seen, the act authorizes the acquisition only of lands on which the milldam is situated, and lands or rights in land adjacent thereto, and not of riparian lands, or rights in

riparian lands, on the lake; and, of course, it makes no provision for the payment of compensation for any such riparian lands, or riparian rights.

The act provides for the assessment, by appraisers appointed by the court, upon such lands in Hennepin county as they deem specially benefited by the improvement, such sum as they shall deem a just proportion of the total cost of the purchase or condemnation. Under this act, the board of county commissioners established the "uniform height" at which the waters of the lake should be maintained at 220.91, measured from the base line referred to.

This is considerably above average natural low water, and below natural extreme high water in wet seasons.

Of course, the effect of maintaining the water at the "uniform height" thus established would be to make such height permanent low water, except, possibly, in very dry times, when the water might altogether cease to run over the dam, and evaporation would reduce it somewhat below that level.

The evidence shows that the effect of uniformly maintaining the water of the lake at the height thus established would be to overflow permanently some of these low riparian lands, or, at least, to render them so wet as to destroy or seriously impair the value, for pasture or meadow, which they would have if the waters of the lake were left at their natural level.

The board of county commissioners, having acquired the milldam, and adjacent lands at a cost of some $12,000, caused further proceedings under the act to be had by which assessments for benefits were made against the lands deemed benefited. Upon application to the court, an order was made, against the objections of the appellants, confirming the assessments against their lands, and from this order they appeal.

Various objections to these assessments were interposed, but, as we view the case, it is only necessary to consider one. To support an assessment for benefits against the lands of appellants, it must appear that they will receive the benefits for which they are asked to pay. In other words, if, for any cause, the right to maintain the water at the height fixed by the commissioners cannot be secured under the act, the assessments are invalid; for this is the very benefit for which appellants are taxed.

As no provision is made for compensation to riparian owners on the lake, it follows that, if they are entitled to compensation,—in other words, if what is proposed to be done constitutes a taking of their property,—the assessments are void.

The respondents claim the right to maintain the water to the height established, without paying compensation to these riparian owners, on two grounds: *First,* that the state has the right, in aid of navigation, to raise and permanently maintain navigable waters up to ordinary high-water mark without making compensation to riparian owners. *Second,* that the owners of the milldam on Minnehaha creek had acquired a prescriptive right, as against riparian owners, to raise and maintain the water of the lake at a height as great as that established by the county commissioners under this act. The second proposition may be disposed of very briefly. In the first place, the court below declined to pass upon it, but based its decision exclusively on the first ground. Again, the evidence was, at least, not such as to require a finding that any such prescriptive right had been acquired. It, perhaps, did appear that the milldam had been continuously maintained for over 20 years at a height sufficient to maintain the water at the uniform height established by the commissioners. But merely maintaining a dam on one's own land, without thereby raising the water, will not create a prescriptive right upon the lands of another. It is only the uninterrupted flowing of such lands for the statutory period that will create such a right. The evidence tends to show some very considerable intervals during which the water was not maintained at any such height as is now proposed, and which would, therefore, interrupt the prescription. The evidence also tends to show that, when the mill was in operation, the water was drawn down by means of gates for power to turn machinery, and hence, of necessity, the height of the water must have been, much of the time, below that "uniform height" which it is now proposed to constantly maintain under this act.

It remains, then, to consider the first ground, viz. the right of the state, in aid of navigation, to raise and permanently maintain the water up to ordinary high-water mark without making any compensation to riparian owners. While the title of a riparian owner on navigable or public waters extends to ordinary low-water mark,

yet it is unquestionably true that his title is not absolute, except to ordinary high-water mark. As to the intervening space, the title of the riparian owner is qualified or limited by the public right. The state may not only use it for purposes connected with navigation without compensation, but may protect it from any use of it, even by the owner of the land, that would interfere with navigation.

It may be conceded, as claimed by respondent, that "within the banks, and below high-water mark, the public right is supreme, and that damages to riparian proprietors are *damnum absque injuria.*" But the question is what is "high-water mark," as the line between the riparian owner and the public, and below which his title is thus qualified by the public right? It seems to us that it is right here where both the trial court and counsel have fallen into error. It seems to have been assumed that "high-water mark" means the extreme line which the water reaches (even outside its natural channel or bed) in times of high water, caused by rains or melting snows, which are not unusual or extraordinary, but occur annually, or at least frequently, during the wet season. The consequences of any such rule, if applied to our navigable rivers and inland lakes, would be very startling. Take, for example, the Mississippi river. It is subject to periodical, and almost annual, rises, usually in the spring, when the water overflows its banks, and submerges thousands of acres of bottom lands which are, at other seasons of the year, dry and valuable for timber, grass, and even agriculture. The stage of water necessary to overflow these lands is not extraordinary or unusual high water, in the popular sense, for it is liable to occur, and does occur, almost every year. And yet it would hardly be claimed that the title of the owners of these lands is qualified, and that the public might, in aid of navigation, by dams or other artificial means, maintain the water of the river at such a height as to permanently submerge and destroy these lands, without making compensation to the owners. Any such definition of "high-water mark," as a line between riparian owners and the public, is clearly inapplicable to inland fresh-water rivers and lakes, which are subject to frequent rises, causing them to overflow their natural banks.

"High water," as applied to the sea, or rivers where the tide ebbs and flows, has a definite meaning. It is marked by the periodical flow of the tide, excluding the advance of the water above the line,

in the case of the sea, by winds and storms, and, in the case of the river, by floods and freshets.    But, in the case of fresh-water rivers and lakes,—in which there is no ebb and flow of the tide, but which are subject to irregular and occasional changes of height, without fixed quantity or time, except that they are periodical, recurring with the wet or dry seasons of the year,—high-water mark, as a line between a riparian owner and the public, is to be determined by examining the bed and banks, and ascertaining where the presence and action of the water are so common and usual, and so long-continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as respects the nature of the soil itself.

"High-water mark" means what its language imports,—a water mark.    It is co-ordinate with the limit of the bed of the water; and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes.    Ordinarily, the slope of the bank and the character of its soil ·are such that the water impresses a distinct character on the soil, as well as on the vegetation.    In some places, however, where the banks are low and flat, the water does not impress on the soil any well-defined line of demarcation between the bed and the banks.    In such cases, the effect of the water upon vegetation must be the principal test in determining the location of high-water mark, as a line between the riparian owner and the public.    It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop,—for example, hay.    *Howard* v. *Ingersoll*, 13 How. 381; *Stover* v. *Jack*, 60 Pa. St. 339; *Houghton* v. *Chicago, &c., Railroad Co.*, 47 Iowa, 370; *Plumb* v. *McGannon*, 32 U. C. Q. B. 8; Gould, Waters, § 45.

The evidence tends to show that what is proposed to be done under this act is to permanently maintain the water at a uniform height above high-water mark, as thus defined, to the material damage of lands of riparian owners.    This constitutes a taking of their property which entitles them to compensation.    *Weaver* v. *Rum River Boom Co.*, 28 Minn. 534, (11 N. W. 114.)    It follows that

the benefits for which appellants' lands have been assessed are not secured to them by the proceedings under this act.

We have assumed as facts what the evidence tends to prove, but it is proper to add that these proceedings are not conclusive on the riparian owners who are not parties to them; and, as the act contains no provision for making them parties, it is impossible, in any proceedings under it, to certainly determine that any benefit is secured to appellants.

Order reversed.

(Opinion published 58 N. W. Rep. 295.)

Application for reargument denied April 6, 1894.