# EDWARD ERDMAN v. WATAB RAPIDS POWER COMPANY and Another.[1]

### Nos. 16,687—(170).

### August 26, 1910.

**Definition of high-water mark.**

By high-water mark is meant those points along the shore where water rises to such a height as may reasonably be anticipated, but it does not include such extraordinary freshets and floods as cannot be anticipated. Ames v. Cannon River Mnfg. Co., 27 Minn. 245.

**Evidence — verdict.**

The evidence is sufficient to sustain the jury in finding that the land upon which respondent's crops were located was above the high-water mark of Little Rock lake; and in finding that the crops were damaged to the extent of $100 by such overflow, and that the overflow was caused by a dam maintained in the Mississippi river by appellant which backed the water up the river through the creek into the lake.

**Evidence — government chart of river.**

It was not error to receive in evidence, over the objection that no proper foundation was laid, a government chart which contained the data of soundings of the river, a witness having testified from the chart what the soundings were, and no further objection having been made, and no motion having been made to strike out the chart or testimony.[2]

**New trial.**

The court did not abuse its discretion in denying appellant's motion for a new trial upon the ground of newly discovered evidence.

### November 25, 1910.

**Evidence — waiver of objection.**

Where a chart offered in evidence was objected to as incompetent and

---

[1] Reported in 127 N. W. 487, 128 N. W. 454.  [2] See opinion on page 182.

because no proper foundation was laid, and the objection was overruled, it was not waived by permitting a witness to be examined with reference to it without further objection.

Action in the district court for Benton county against the Watab Rapids Power Company and the Watab Pulp & Paper Company to recover $570 damages to crops caused by defendants' alleged unlawful acts and $5,000, in the event it should be held by the court that a certain dam was permanent in its character and that defendants had a legal right to maintain it. Among other matters the complaint alleged that neither of the defendants possessed the power of eminent domain; that they had wrongfully constructed the dam; that its erection and maintenance were a continuous and menacing nuisance to plaintiff's property; that plaintiff's damages occasioned thereby were irreparable; that unless such nuisance were abated he would be obliged to bring and maintain a succession of suits, and that said dam should be abated as a nuisance and removed as an obstruction to the natural flow of the waters of the Mississippi river. The answer alleged that the right to build the dam was granted before its construction by the congress of the United States, approved by the president, and its location and type approved by the secretary of war; that defendants, or one of them, have been the owners of the lands upon which are located the dam and structures used in the operation of the manufacturing business in connection therewith; that all flowage necessary to the operation of the dam defendants have duly acquired; that defendant Watab Pulp & Paper Company was the sole owner of said power dam at the time of the commencement of this action, of all the lands upon which the same were located, of the paper and pulp mill and works and flowage rights. The reply alleged plaintiff had no knowledge as to whether defendants had ever obtained license from the United States to construct a dam across the Mississippi river within the limits of the village of Sartell; denied that defendants were the owners or had ever acquired flowage necessary to the operation of the dam, and alleged that a large portion of the land affected by the back water and flowage from the dam, including the land of plaintiff, was never acquired by defendants. The case was tried before Taylor, J., and a jury which returned a verdict in favor

of plaintiff as stated in the opinion. From an order denying defendants' motion to set aside the verdict and for a new trial, they appealed. Reversed.

*Stewart & Brower,* for appellants.

*J. D. Sullivan,* for respondent.

LEWIS, J.

Appellant is the owner of a power dam on the Mississippi river at Sartell, Minnesota. The plant has been in operation since March, 1907, and this action was brought for the purpose of recovering damages for overflowing lands of respondent located on Little Rock lake, at a point about twelve miles above the dam. Four special questions were submitted to the jury, and answered as follows:

"1. Are you able to determine, after considering all the evidence in the case, whether the dam of the defendants did or did not cause water to flow upon the land of the plaintiff in the year 1908, which water would not have flowed upon his land if defendants' dam had not existed?" Answer: Yes.

"2. Did the dam of the defendants cause water to flow upon the land of the plaintiff in the year 1908, which water would not have flowed upon his land if defendants' dam had not existed?" Answer: Yes.

"3. What was the amount of damage sustained by the plaintiff on account of injury to his crops and grass by water from Little Rock lake overflowing portions of his land in the year 1908?" Answer: $100.

"4. What was the amount of damage, if any, sustained by plaintiff in the year 1908 on account of injury to his crops and grass by water which was caused to flow upon them by the dam of the defendants and which would not have flowed upon them if said dam had not existed?" Answer: $100.

Appellant submits that the evidence conclusively shows that the overflow and consequent damage to respondent's hay and crops was by an unusual and unanticipated flood of water, and that the dam was in no way responsible therefor.

The power generated by the dam operates a pulp mill, by means

of fifty-two water wheels, and the dam is a very formidable structure, several hundred feet long, with ample provision for sluiceways and gates to take care of the surplus waters. The height of the crest of the dam proper above the "medium low-water mark" was fifteen feet, but provision was made for the use of flashboards, so that the head of water could be raised three additional feet. Little Rock creek empties into the river at a point about four miles above the dam. It is about two miles long and the outlet of Little Rock lake, which is about three miles long, with an average width of a little less than a mile, on the easterly side of which is located respondent's land, consisting of several hundred acres. By actual measurement the height of water in the river at its ordinary stage at the mouth of Little Rock creek was three feet lower than the water in the creek at the outlet of the lake at the Northern Pacific bridge, and the level of the water in the lake was from two to four inches higher than the water in the creek at the bridge. At the ordinary stage of water the crest of the dam was on a level with the water in the river at the mouth of the creek, and the top of the flashboards, when in, was on a level with the water in the creek at the Northern Pacific bridge. It was also proven that the top of the flashboards was on a level with the surface of the water at the ordinary stage in the river about four miles above the mouth of the creek. During the time of the overflow the water reached the depth of eight and one-half feet over the crest of the dam, and from eight to ten feet above the ordinary stage at various points above and below the dam, which condition existed for nearly two weeks and during a rainy period.

Appellants' expert witness declared that there were certain general laws in physics which controlled the case. Those laws, as stated, are that the curve where the waters of a stream meet with the waters of a mill pond advance toward the dam as the waters in the stream increase in volume. And again: "If the escape of water over the dam is such that it keeps the water in the pond at a lower level; than,—or at a less depth above the ordinary stage than is obtained in the river above the pond, then the backwater line must continually approach the dam." Also, that, when the stage of water over the dam attains the height of the dam itself, the dam ceases to be an

obstruction. When asked to apply these rules to the condition exist-
ing in June, 1908, as shown by the evidence, he testified that, as the
flood stage increased to the height of eight or ten feet above the ordi-
nary flow of the river, the effect of the dam as an obstruction was
less than it would have been had ordinary conditions continued to
prevail; that the distance upstream in which the water would be
affected by the dam would be reduced in a flood period over what it
would have been when the water was at the ordinary stage.

The expert witnesses called on behalf of respondent accepted the
application of these general rules with some qualifications, and
claimed that for a certain length of time after the water in the pond
had risen even with the crest of the dam there would continue to be
a backward movement of the meeting point of the waters coming
down the river with the waters in the pond, and that when such move-
ment would cease depended on many conditions, and was largely a
matter of guesswork. It would depend on the character of the pond,
and the manner in which the dam was manipulated. Had the dam
been absent, the water coming down the river would have had the
benefit of a fifteen-foot fall in something less than four miles. If
the theory of appellant is true that the dam ceased to be an obstruc-
tion after the water in the pond reached the level of three feet above
the crest of the dam, then it would seem that an eight-foot head of
water above the ordinary stage at the mouth of the creek would back
up and raise the level of the lake five feet above its ordinary stage.
This would occur if the dam were not in the river. But theoretical
reasoning does not necessarily solve the question, and the expert tes-
timony must be considered in connection with the other evidence in
the case.

Evidence was received tending to show that during the ordinary
stage the water never backed up beyond the fifteen-foot level, if used.
Witnesses called on behalf of appellant testified that at no time dur-
ing the years 1907, 1908, and 1909 did the dam have any effect
upon backing the waters above the fifteen or eighteen foot level.
Other witnesses called by respondent testified that, after the erection
of the dam, the stage of the river above the creek under ordinary
conditions was two to three feet higher than it would have been

without the dam. At the ordinary stage of water this point in the river was on a level with the water in the creek at the Northern Pacific bridge. Witnesses testified that the waters in Little Rock creek and in the lake were higher than they had been under similar conditions prior to the erection of the dam, and that the rain fall was the ordinary June flood. Here was a square contradiction. The evidence is not conclusive that the increased flow was due to the drainage of territory tributary to the Mississippi river and its feeders, and that the dam had no effect.

While the exact point may not have been definitely fixed where the dam ceased to have effect during high water, it may fairly be inferred from the evidence that the effect in retarding the flow of the river above the dam was far greater than claimed by appellants. Of course, if the condition at the mouth of the creek would have been the same with or without the dam, then a rise of eight feet in the river would cause the lake to rise five feet. But it seems quite clear that the same conditions did not exist. That backwater continued up stream for a considerable time after the pond had filled to a level with the crest of the dam seems reasonably certain. A part of the crops for which respondent claims damage was above high-water mark, and, if the rise in the river was not unusual, there was reasonable ground for the claim that the dam was the cause of pushing the water to the extraordinary height reached on this occasion. The owner of lands bordering upon a navigable stream or lake is entitled to recover damages for such overflow as may occur above what is known as the ordinary high-water mark. By high-water mark is meant those points where the water usually rises, such rises as may be reasonably anticipated, but does not mean such extraordinary freshets as cannot be anticipated. Ames v. Cannon River Mnfg. Co., 27 Minn. 245, 6 N. W. 787.

During the month of June, 1908, the grass land and fields of appellant bordering upon Little Rock lake were overflowed, and, to some extent, damaged. There was evidence tending to prove that the grass and crops in question were located at a point above the ordinary high-water mark. There was evidence to the effect that part of May and June, 1908, was a rainy period, but the evidence

was not conclusive that it was unprecedented and such as could not have been anticipated. The evidence upon this point was contradictory, and, as in all such cases, more or less unsatisfactory and indefinite, but its weight was for the trial court and jury, and it cannot be said that it conclusively appears from the record that the flood period so-called of June, 1908, was greater or different from that which occurred generally in other seasons, and that the dam was in no way accountable for the result.

The jury answered the special questions submitted to them by finding that the dam was the cause of the entire amount of the resulting damage. Appellants insist that the evidence does not support this conclusion of the jury. That respondent suffered some damage to the grass and crops located above the ordinary high-water line is beyond question. Evidence was received to the effect that the damage was more than the amount returned, and we are unable to say that the evidence does not sustain the jury in arriving at the figures it reached, although it might have justified them in finding it to have been less.

Respondent introduced in evidence a government chart—Exhibit C—which contained data of the soundings across the river in the vicinity of the mouth of Little Rock creek, taken under the supervision of the United States government in 1898. Counsel for respondent proceeded to have a witness testify from the chart what those soundings were when the objection was made that no proper foundation had been laid for such testimony, since it was not shown that the same conditions existed in 1898 as in 1908. Counsel for respondent stated that he would come to that later, and the objection was overruled. The witness testified as to what the soundings were as shown by the chart. He was subjected to cross-examination on the same subject, but no further objection was made to the use of the chart, and no motion was made to strike out either the testimony or the plat. Possibly a proper foundation had not been laid, but under the circumstances appellant is not in a position to raise the question.

We have examined the affidavits in support of the motion for a new trial on the ground of newly-discovered evidence, and are of

opinion that the trial court did not abuse its discretion in denying the motion upon that ground. We discover nothing which might not be claimed as cumulative or which might not have been discovered in time for trial by the exercise of reasonable diligence.

Affirmed.


On November 25, 1910, the following opinion was filed:


PER CURIAM.

On the reargument it was insisted by counsel for appellants that it conclusively appears from the record that the presence of the dam in the river did not, and could not, have any effect in causing the high waters which injured plaintiff's crops. As stated in the opinion, we consider the evidence conflicting upon that question, and the credibility of the witnesses was for the jury. But inasmuch as the question was closely contested, and the evidence was conflicting, we are now satisfied that the reception in evidence of Exhibit C was prejudicial. This chart contained a statement of the soundings of the river which had been taken under the supervision of the United States government in 1898, ten years prior to the time the injury complained of occurred. It was objected to upon the ground that it was incompetent, irrelevant, and immaterial, and that no proper foundation had been laid.

We were in error in holding that the objection was waived by permitting a witness to be examined with reference to it without further objection. The objection was directed to the chart itself, and not to the testimony of the witness. Whether the dam was the cause of the deeper stage of water at and above the creek was the important issue. If the soundings of the chart were correct, then the soundings of 1908 showed that the water was higher at those points at the latter date. It cannot be presumed that the bed of the river was the same in 1898 as it was in 1908, and hence the evidence was prejudicial.

New trial granted.