# JOHN W. MITCHELL v. CITY OF ST. PAUL AND ANOTHER.[1]

February 6, 1948.

No. 34,303.

[1]Reported in 31 N. W. (2d) 46.

*Bundlie, Kelley, Finley & Maun* and *Mandt Torrison,* for appellant.

*Bruce J. Broady,* Corporation Counsel, and *William M. Serbine,* Assistant Corporation Counsel, for respondents.

MAGNEY, JUSTICE.

Verdict for defendants. Plaintiff appeals from an order denying his motion for a new trial.

Plaintiff is the owner of lands riparian to Lake Vadnais and Twin Lake in Ramsey county. He claims that in 1942 said lands were damaged by trespass by water because of improper control of water elevations by defendant St. Paul board of water commissioners.

Lake Vadnais, with an area of 477 acres, is one of a chain of lakes used by the board to furnish water to the inhabitants of the city of St. Paul. It is a controlled reservoir. Water comes into the lake naturally and is also put in artificially. It is taken out by conduits. Twin Lake, with an area of about 110 acres, lies about 400 feet south of Lake Vadnais at a lower elevation of about 11 feet. Plaintiff is the owner of part of lot 4, section 32, township 30, range 22, with a frontage of 400 to 450 feet on the southeast shore of Lake Vadnais, and of part of lot 4, section 31, of the same township and range, with a frontage of about 400 feet on Twin Lake. Both frontages are improved.

Originally, the water of Lake Vadnais overflowed into Twin Lake through a natural channel which took off from Lake Vadnais at a point near the west line of plaintiff's land. Many years prior to May 1942, defendants built a dam or embankment of earth and concrete near the shore line of Lake Vadnais, with a culvert therein to take care of overflow of the lake before it reached a dangerous level. Plaintiff claims that in May 1942, by acts of defendants, the water in Lake Vadnais was raised to a height above the natural and ordinary water level of the lake and above the ordinary natural high-water level, damaging the shore line of Lake Vadnais, overflowing into Twin Lake, and also damaging the shore line of Twin Lake. Defendants contend they had acquired the right by adverse posses-

sion to maintain the water level of Lake Vadnais to the height it reached in May 1942, a contention which is denied by plaintiff.

We shall first consider the shore line owned by plaintiff on Lake Vadnais. From the northwesterly edge of his property, it curves toward the southeast and then to the northeast. A short distance from the shore line to the south is the embankment heretofore mentioned, and beyond that and slightly overlapping the embankment is Vadnais Boulevard, a Ramsey county highway. The land on Lake Vadnais which plaintiff claims was damaged lies between the fence along the north line of the boulevard right of way and the shore line. The built-up roadway and the embankment act as a dam.

The embankment was first constructed many years ago. The natural outlet near the northwest corner of plaintiff's land was dammed, and a concrete culvert was installed about 200 feet west of plaintiff's land. Wholly imbedded in the embankment is a "core wall" built of concrete. The floor level of the culvert was approximately at the height of the top of this "core wall." In 1917, the county of Ramsey was granted a 66-foot easement by a prior owner thereof for road purposes across plaintiff's land, and Vadnais Boulevard is located on this easement. An ornamental fence has been constructed on both sides of this right of way. As stated, the right of way adjoins the embankment to the south and at certain points overlaps it. Since plaintiff in this action does not contend that the embankment and the boulevard encroach upon any of the rights claimed by him in this action, it is unnecessary to go into any further detail as to when, how, or by whom they were constructed.

It must be conceded that the county had a right to construct the boulevard to any height thought necessary or desirable for highway purposes.

Plaintiff claims that, even if rights had been acquired to maintain the roadway and the embankment to their present elevations, such rights do not permit defendants to maintain the water level of the lake to those heights; that the height of the embankment or the roadway has no bearing whatever upon the height to which defendants have acquired the right to maintain the water level; and that

they have no right to maintain a water elevation in Lake Vadnais above the normal high-water mark. He contends that defendants did raise the water level above the normal high-water mark and damaged the narrow strip of land lying between the normal high-water mark and the embankment and road. The strip of land on Lake Vadnais involved is about 329 feet long with an average width of 12 feet, which varies from 30 to 35 feet to 6 to 10 feet. In 1935, some damage was done to this shore line, and defendants put in riprapping along the water's edge to prevent water erosion. From the top of the bank to the riprapping it is about 16 feet. The flood of 1942 did no damage to the riprapping. The damage was above it. Plaintiff does not contend that he is entitled to recover for any damage to his land lying above the original natural high-water mark of the lake as it existed before it became a controlled reservoir, but he claims recovery for damages to his land which lies above the normal artificial high-water mark of the lake as it has been established during the years that the lake has been used by defendants and their predecessors as a part of the water system. In his brief, plaintiff states:

"* * * At any event, since the lake has been under control, the artificial ordinary high must be somewhere between the mean low of 183.07 and the mean high of 186.95. It could not be higher than the latter figure."

There can be no doubt that defendants have acquired the right to raise the water to normal artificial high-water mark. In raising the water *above* this elevation, plaintiff claims that defendants trespassed and that they are therefore liable for the resulting damages, irrespective of negligence. Defendants, on the other hand, claim that they acquired the right to maintain the water level of the lake to the top of the embankment, which averages about 191.6 city datum, and therefore that they had a right to flood the narrow strip of land above mentioned.

Assuming the right of the county to maintain Vadnais Boulevard to the height it is now constructed, and assuming the

right of defendants to maintain the embankment to its present height, it does not follow that defendants acquired a prescriptive right to maintain the water level up to the elevation which they claim. In Carpenter v. Board of Co. Commrs. 56 Minn. 513, 58 N. W. 295, 45 A. S. R. 494, a dam on Minnehaha Creek, the outlet of Lake Minnetonka, was involved. The object of the dam was to enable the owners of a mill to use the creek as a millpond in which to store the waters at certain seasons of the year and drain them off at others as required for the use of the mill. Extreme high water reached an elevation of 223.65, while the extreme low was of 217.84, a variation of almost six feet. Under Sp. L. 1891, c. 381, the county board established the "uniform height" at which the waters should be maintained at 220.91. The court, in an opinion written by Mr. Justice Mitchell said (56 Minn. 520, 58 N. W. 296):

"* * * But merely maintaining a dam on one's own land, without thereby raising the water, will not create a prescriptive right upon the lands of another. It is only the uninterrupted flowing of such lands for the statutory period that will create such a right. The evidence tends to show some very considerable intervals during which the water was not maintained at any such height as is now proposed, and which would, therefore, interrupt the prescription. * * *

"* * * While the title of a riparian owner on navigable or public waters extends to ordinary low-water mark, yet it is unquestionably true that his title is not absolute, except to ordinary high-water mark. As to the intervening space, the title of the riparian owner is qualified or limited by the public right. The state may not only use it for purposes connected with navigation without compensation, but may protect it from any use of it, even by the owner of the land, that would interfere with navigation.

* * * * *

"* * * in the case of fresh-water rivers and lakes, * * * high-water mark, as a line between a riparian owner and the public, is to be determined by examining the bed and banks, and ascertaining where the presence and action of the water are so common and

usual, and so long-continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as respects the nature of the soil itself.

" 'High-water mark' means what its language imports,—a water mark. It is co-ordinate with the limit of the bed of the water; and that, only, is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes. * * * It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, constituting what may be termed an ordinary agricultural crop,—for example, hay. [Citing cases.]

"The evidence tends to show that what is proposed to be done under this act is to permanently maintain the water at a uniform height above high-water mark, as thus defined, to the material damage of lands of riparian owners. This constitutes a taking of their property which entitles them to compensation."

In Gravel v. Little Falls Imp. & Nav. Co. 74 Minn. 416, 419, 77 N. W. 217, this court, in holding that defendant had no right to overflow plaintiff's land above ordinary high-water mark, said:

"* * * That right could only be acquired by grant or by the exercise of the right of eminent domain, and the payment of compensation to the owner of the land. Weaver v. Mississippi & R. R. Boom Co., 28 Minn. 534, 11 N. W. 114; In re Minnetonka Lake Improvement [Carpenter v. Board of Co. Commrs.], 56 Minn. 513, 58 N. W. 295 [45 A. S. R. 494]; Carlson v. St. Louis River D. & I. Co., 73 Minn. 128, 75 N. W. 1044 [1046, 41 L. R. A. 371, 72 A. S. R. 610]."

In the Carlson case, the court said (73 Minn. 133, 75 N. W. 1046):

"The defendant does not claim that any attempt was made to condemn plaintiff's land, and we are of the opinion that its rights were restricted to the use of the stream in such case so as not to raise the water above the usual, natural and ordinary high-water mark."

In the Carpenter case it was also stated (56 Minn. 521, 58 N. W. 296):

"It may be conceded, * . * * that 'within the banks, and below high-water mark, the public right is supreme, and that damages to riparian proprietors are *damnum absque injuria.'*"

See, State ex rel. Beise v. District Court, 83 Minn. 464, 86 N. W. 455.

In Stenberg v. County of Blue Earth, 112 Minn. 117, 120, 127 N. W. 496, 497, the court said:

"* * * The law justified the maintenance of the lake at its natural and usual height and level. That height, necessarily more or less marked 'upon the soil of the bed [of the lake, has] a character distinct from that of the banks in respect to vegetation as well as respects the nature of the soil itself.' Damages consequent thereon to riparian owners was damnum absque injuria, for which they were entitled to no compensation. Mitchell, J., in Re Lake Minnetonka Improvement [Carpenter v. Board of Co. Commrs.], 56 Minn. 513, 58 N. W. 295, 45 Am. St. 494.

"* * * The rule laid down in the Minnetonka case is not reasonably to be construed as limiting the right of the public to increase the level of the body of water to cases wherein the water mark made by vegetation appears everywhere on the shore line. Indeed, the character of the vegetation itself may constitute a water mark."

Also, in State ex rel. Anderson v. District Court, 119 Minn. 132, 136, 137 N. W. 298, 299, the court stated:

"* * * The rights of riparian owners in this respect were fully considered by the court in Carpenter v. Board of Commrs. of Hennepin County, 56 Minn. 513, 58 N. W. 295 [45 A. S. R. 494], where it was held that riparian rights below the ordinary mark of high water were subject to the superior right of the public, and that a taking thereof by the authorities for a public use, as by raising the waters of a lake for purposes of navigation or the public health, was a damage for which no recovery could be had. The same rule

was followed and applied in Stenberg v. County of Blue Earth, 112 Minn. 117, 127 N. W. 496, and other cases."

In Gniadck v. Northwestern I. & B. Co. 73 Minn. 87, 89, 75 N. W. 894, this court discussed this question as follows:

"While the title of a riparian owner in navigable or public waters extends to ordinary low-water mark, his title is not absolute except to ordinary high-water mark. As to the intervening space, the title is limited or qualified by the public right. The state may use this space for the purpose of navigation, and within the well-defined banks and below ordinary high-water mark the public right is supreme."

In State v. Korrer, 127 Minn. 60, 76, 148 N. W. 617, 623, L. R. A. 1916C, 139, the court again stated the rule when it said:

"* * * While the title of a riparian owner in navigable or public waters extends to ordinary low-water mark, his title is not absolute except to ordinary high-water mark. As to the intervening space his title is limited or qualified by the right of the public to use the same for purpose of navigation or other public purpose. The state may use it for any such public purpose, and to that end may reclaim it during periods of low water, and protect it from any use, even by the riparian owner, that would interfere with its present or prospective public use, without compensation."

In Erdman v. Watab Rapids Power Co. 112 Minn. 175, 180, 127 N. W. 487, 489, another definition of high-water mark was given. The court said:

"* * * The owner of lands bordering upon a navigable stream or lake is entitled to recover damages for such overflow as may occur above what is known as the ordinary high-water mark. By high-water mark is meant those points where the water usually rises, such rises as may be reasonably anticipated, but does not mean such extraordinary freshets as cannot be anticipated. Ames v. Cannon River Mnfg. Co., 27 Minn. 245, 6 N. W. 787."

Since prior to 1869, Lake Vadnais has been used as a source of water supply for the inhabitants of the city of St. Paul. Using it for water storage, as part of the waterworks system, is the use of it for a public purpose. Defendants were authorized to use it for such purpose. Sp. L. 1885, c. 110. In Minneapolis Mill Co. v. Board of Water Commrs. 56 Minn. 485, 490, 58 N. W. 33, 34, the court said:

"The navigation of the stream is not the only public use to which these public waters may be thus applied. The right to draw from them a supply of water for the ordinary use of cities in their vicinity is such a public use, and has always been so recognized. At the present time it is one of the most important public rights, and is daily growing in importance as population increases. The fact that the cities, through boards of commissioners or officers whose functions are to manage this branch of the municipal government, charge consumers for water used by them, as a means for paying the cost and expenses of maintaining and operating the plant, or that such consumers use the water for their domestic and such other purposes as water is ordinarily furnished by city waterworks, does not affect the real character of the use, or deprive it of its public nature."

■ It is plain from the cases cited that in using Lake Vadnais as a reservoir—a public purpose—defendants may maintain the water level up to the high-water mark. Plaintiff recognizes this right. He suggests that 186.95 city datum is the average annual high-water mark, and in his brief he claims that "a trespass was committed by water upon all of the Mitchell land lying above elevation 186.95, which is the average annual high water mark." This elevation is arrived at by taking an average of the highest point reached by the water in any one year. This may or may not be the true high-water mark. In the period from 1901 to 1943, inclusive, the maximum water elevation for 37 years was above 187, and in that same period the maximum elevation for 19 years was above 188 (exhibit 48). From December 1, 1941, to May 1, 1942, the elevation varied from a low of 187.29 in January and February to a high of 188.60 on April 20. The record here does not show at what elevation the

high-water mark is reached. The proper test for the determination of the elevation of the high-water mark as laid down in the Carpenter case was not followed. Even under the definition of "high-water mark" as given in Erdman v. Watab Rapids Power Co. 122 Minn. 175, 127 N. W. 487, *supra*, plaintiff's method of arriving at the high-water mark is not in compliance therewith. Plaintiff, therefore, failed to show by proof where his rights began and where defendants' rights ended. It may be that the actual high-water mark reached the embankment. If that were the case, defendants would have the right to flood to that point. We do not say that the high-water mark reached the embankment. Under the rules laid down and herein quoted, we have no way of knowing where the high-water mark is. If there was any land owned by plaintiff lying between the true high-water mark and the fence located on the north line of Vadnais Boulevard right of way which suffered any damage from water by reason of any action or omission on the part of defendants, then defendants would be liable in trespass. If there was damage to such land by water which was not brought thereon by reason of any actions or omissions by defendants, no liability could be charged to defendants. Since plaintiff is claiming damages, it is incumbent upon him to produce evidence to show where his exclusive rights begin, to show above what elevation defendants had no right to flood. This he has not done, and the case could well end here for failure of proof. However, irrespective of what has been said up to this point, in our opinion the flooding and damage to plaintiff's land was not caused by any act or omission on the part of defendants.

■ At Fridley on the Mississippi River defendants operate a pumping station. At this station, water is taken out of the Mississippi and sent through a conduit eight miles in length into defendants' water supply system, including Lake Vadnais. That lake is one of a chain of lakes. Certain lakes to the north of the point where the water pumped from the Mississippi enters the system are a part of it, but from January 1, 1942, until November 1942 that supply was cut off. All the water used in 1942 was water which

was pumped from the river or was naturally collected into the Vadnais system itself. The so-called Vadnais system, in addition to Lake Vadnais itself, consists of three lakes between it and the point of entry of the conduit from Fridley. In recent years, defendants have depended almost entirely on water from the Mississippi to replenish water taken from Lake Vadnais. The maximum capacity of the Fridley pumps is 35 million gallons a day. Two conduits five and a half miles long carry the water from Lake Vadnais to McCarron Station, from which it is distributed to city consumers. The average daily consumption of water is 24 million gallons. During the year 1941, defendants put into Lake Vadnais 28 million gallons more than was taken out. That would cause the lake to rise 0.2 of a foot, or 2½ inches. In January 1942, 104 gallons more were taken out of the Lake Vadnais system through the conduits to McCarron than were put in by the operations of the waterworks. Natural and artificial causes resulted in a loss of 17 million gallons to the lake. In February 1942, natural causes effected a gain of 4 million gallons more than was taken out. In that month the department put in 90 million gallons more than it took out. In March 1942, natural causes resulted in a gain of 38 million gallons more than was taken out, and because of waterworks operations 14 million gallons more were taken out than were put in. In April 1942, 39 million gallons of water were added to the lake by reason of natural causes and the waterworks operations in the same month. Because of waterworks operations, 14 million gallons more were taken out than put in. In May 1942, 429 million gallons were added to the lake by natural causes, that is, over and above losses by the same cause, and in that month there were 108 million gallons more taken out through the conduits than were put in. Thus, from January 1, 1942, to May 31, 1942, 150 million gallons more were taken out by waterworks operations than were put in by such operations. In June 1942, 428 million gallons were added to the lake by natural causes, and during that same month there were 617 million gallons more taken out of the lake by the waterworks operations than were artificially put in. In July 1942,

194 million gallons more were taken out than were put in by the waterworks operations.

Because of great precipitation in May and June 1942, there was an immense addition to the volume of water in the Vadnais lake system. Because of waterworks operations, the lake level did not reach the height it would otherwise have reached. In those two months, defendants, through the conduits to McCarron Station, took out a total of 725 million gallons more than they put in. Those figures submitted by defendants were not challenged. They were taken from official records.

Frank W. Gallagher, senior assistant civil engineer of the board of water commissioners, who had been with the commission since 1922, testified that from January through May 1942, "The net effect of waterworks operations on Lake Vadnais for that period was the discharge of 150 millions of gallons more water than were put into the lake by the waterworks, and that water put in was both artificial and natural waters and that would have had the effect of lowering the lake level one and two-tenths feet or about one foot and three inches, very nearly." In his opinion, if it had not been for the operations of the water department for that period the lake level would have been over a foot higher.

In April 1942, 765 million gallons were pumped at the river station, and in May, up to May 29 at 9 a.m., when the station was struck by lightning and put out of commission, 650 million gallons were pumped. In that latter month, 754 million gallons were delivered to the filter plant at McCarron. The 754 million gallons does not indicate all the water which left Lake Vadnais through the two conduits which carried the water to the filter plant. Some water leaked through the points. On May 30 and 31, 7,710,000 gallons were discharged as waste water, and, in June, 30,600,000 gallons were also discharged as waste water. There was also leakage in the six and one-half miles of pipe from Fridley. Waters lost by leakage are not taken into consideration in the figures given.

The water level of the lake reached 189.01 on May 9, 1942. It varied from 189.14 on May 10 up to 189.30 on May 14. On May 25

it was 189.10. On May 29 it was up to 189.33, or up about four inches from May 9. On May 30 it rose to 190.34, a foot in a day. On May 31 it rose to 190.44, and on June 1 to 190.49. It gradually decreased to 189.33 on June 15. The highest elevation reached prior to this time was 189.59 on November 16, 1906. After May 29, 1942, at 9 a.m., until August 21 of that same year, the only waters which came into the lake were from natural causes. In this connection, it should be stated that the drainage area of Lake Vadnais is 29 miles.

It is evident from the foregoing that the height the water reached the last days of May and the first part of June 1942 was not caused by water introduced into the lake by defendants. They had a right to maintain the water up to a height which is not disclosed by the record. It does disclose, however, that no material damage was caused until the water reached unprecedented heights in the last days of May and the early part of June. The record also indicates that during the month of May 1942 the rainfall was the heaviest in any May month since records have been kept in this vicinity since 1837. The rainfall in May 1942 amounted to 11.29 inches. May 25 to May 31, inclusive, it amounted to 8.91 inches. On May 25, 1.83 inches of rain fell; on May 27, 0.20 of an inch fell; on May 29, 5.57 inches; and on May 30, 1.31 inches. During the other three days there was a trace. The average rainfall for May in St. Paul is 3.27 inches. In May 1906, 10.40 inches of rain fell, the next highest in local weather bureau history. The greatest rainfall in 24 hours prior to May 29, 1942, was in May 1906, when 3.59 inches fell. The rainfall in March and April was slightly above normal. The rainfall from May 25 to May 31 was extraordinary and unprecedented. Not only did it raise the water in Lake Vadnais to the highest level in recorded history, but in an area of within a few miles of this lake it did considerable damage. Roads were flooded, concrete walls damaged, creeks and ditches overloaded beyond capacity, and lakes overflowed their banks. Turtle Lake, a short distance from Lake Vadnais and with no connection

between the two, overflowed its banks to the extent that cabins and garages were surrounded by water.

As stated, plaintiff's evidence failed to disclose the ordinary high-water mark. To what extent the elevation of the water in the lake exceeded that mark can therefore not be determined. Further, undisputed testimony shows that the water department from January 1, 1942, until the time of the claimed damage took out through its conduits to McCarron Station a substantial amount of water over and above the amount it pumped into the lake artificially. Besides, there were the other losses through leakage and wastage. How defendants can be charged with unduly raising the water level is not apparent. Furthermore, there is uncontradicted testimony that an unprecedented amount of rain fell during a period of three or four days—about 8.91 inches—raising the water of Vadnais from 189.33 on May 29 to 190.49 on June 1. The damage to plaintiff's lands occurred during those days. On the record before us, we are unable to spell out any basis for a recovery against defendants for damage to plaintiff's frontage on Lake Vadnais.

The water overflowed from Lake Vadnais through a culvert in the embankment and Vadnais Boulevard and down a natural watercourse to Twin Lake, where plaintiff's frontage on that lake was damaged. What we have heretofore said about the cause for the excessive water in Lake Vadnais applies here. It was some of the same water that caused the Twin Lake damage. Furthermore, at the request of plaintiff's predecessor in title and others, a dam had been constructed by the county of Ramsey and the Northern Pacific Railway Company at the outlet of Twin Lake, which of course prevented water which entered the lake to escape. Plaintiff testified that the high elevation of the water was the chief factor in destroying his sand beach on Twin Lake. Since defendants, in our opinion, cannot be held responsible for the presence of excess water and certainly cannot be held responsible for the retaining dam at the outlet of Twin Lake, we fail to see how any liability has been or could be fastened on defendants for damage to plaintiff's beach on Twin Lake.

404

Many other questions have been raised, such as the validity of the condemnation proceedings of 1869 and the effect of the so-called Farrington deed given in 1881. As these matters have little or no bearing upon the basis for our disposition of the case, they merit no discussion. It might be said that whatever rights defendants acquired under the condemnation proceedings and the deed were not lost by nonusage or abandonment, under the recent decision of Village of Newport v. Taylor, 225 Minn. 299, 30 N. W. (2d) 588, where authorities are cited.

For the reasons above set out, the order of the trial court is affirmed.

Order affirmed.

FRANK T. GALLAGHER, JUSTICE (dissenting).

I think that plaintiff did prove damages to his land by flooding above the high-water mark. The majority opinion holds that he failed in his proof by not showing the location of the high-water mark, but he did show that ever since the lake had been under the control of defendants the artificial ordinary high-water mark was somewhere between the mean low of 183.07 and the mean high of 186.95, and that it could not be higher than the latter figure. He contends that as a consequence there has necessarily been trespass by water at any time when the water was raised to a point higher than 186.95. It is at least a permissible inference that defendants considered 186.95 as the artificial ordinary high-water mark in 1935 when they settled a claim by plaintiff for damage from water trespass by repairing the erosion resulting upon his shore property by riprapping the bank and paying a small money damage. The high elevation of the water was 187.99 at that time. In the present case, the water elevation had reached 189.26 on May 15, 1942. On that day, plaintiff served the following notice on defendants:

"This letter serves notice upon the City of St. Paul and the St. Paul Water Department that by reason of the deliberate raising the water level of Lake Vadnais they have caused erosion to my property, damaging it to an extent quite considerable; and that the damage is continuing and am therefore unable to determine the

full extent of the damage until the City ceases raising such water, causing the excessive flow.

"Last week, I notified Mr. Leonard N. Thompson, Supt. and Chief Engineer of the Water Department, City of St. Paul, over the phone and later called at his office in person directing his attention to the damage by erosion. He stated that he inspected the property and noticed the erosion and that he would have it discontinued. Yesterday, I discovered the lake level higher than at any previous time, that the banks show breaks some ten to twelve feet in height and that the lake has flowed on to the boulevard at a depth, preventing access to my property near the northwest corner."

If his property was damaged in 1935 so that defendants settled his claim when the high elevation of the water was 187.99, there must have been trespass by water on his property in 1942, when the high elevation of the water reached 189.26, the day he served the notice.

It appears from the record that since about 1869 Lake Vadnais has been the principal reservoir for the water supply of the city of St. Paul and that it had been completely controlled artificially for many years prior to the commencement of this action. It further appears that before the time of the damages complained of in this case the highest elevation ever attained on Lake Vadnais since 1885 was on November 16, 1906, when the elevation reached was 189.59.

Defendants claimed as a defense that the high water and damage to plaintiff's property resulted from an unprecedented rainfall on May 29, 1942. However, a review of the notice served by plaintiff on May 15, about two weeks prior to this rainfall, discloses that he claimed damages to his property by reason of the raising of the water level of the lake at the time he served the notice and that he then called attention to the fact that the damage was continuing and that he would be unable to determine the full extent of the damage until the city ceased raising the water level which he claims was causing the excessive flow. It seems to me that plaintiff showed that defendants raised the water of Lake Vadnais, over

which it had control, higher than any possible elevation to which it could claim prescriptive rights. For these reasons, I cannot concur in the majority opinion.

MR. JUSTICE JULIUS J. OLSON took no part in the consideration or decision of this case.