## CHARLES McBURNEY ET AL. v. JAMES YOUNG.

### May Term, 1895.

*What is meant by low water mark.*

By "low water mark," as applied to the boundary of lands bordering on Lake Champlain, is meant *ordinary* low water mark.

Trespass to recover a penalty of ten dollars under No. 79, Acts of 1884, and damages.    Heard at the September term, 1894, Franklin county, upon the report of a referee, Rowell, J., presiding.    Judgment in favor of the defendant, McCarty, without cost, and judgment *pro forma* against the defendant Young for a penalty of ten dollars and six cents damages and costs.    The defendant Young excepts.

The plaintiff was the owner of marsh lands upon the bor-
der of Lake Champlain, and had posted notices upon such
lands prohibiting shooting, trapping, or fishing òn said
lands, in accordance with No. 79, Acts of 1884. The de-
fendant Young was camping upon the shores of Lake
Champlain, and was at the time in question in a boat in
company with McCarty for the purpose of shooting and fish-
ing. McCarty was rowing the boat and the defendant
Young shot at a flock of ducks flying over his head. The
plaintiff claimed that the place where the boat was when
the shot was fired was upon his land; while the defendant
Young contended that it was upon the waters of Lake
Champlain, and this was the question.

The referee reported that the water at that point was
about eight inches deep at the time; that the bottom under-
neath the boat was a firm mud bottom; that the bottom at
that point was at all times of the year covered with water to
the depth of at least six or eight inches, in ordinary seasons,
and that, therefore, it was below ordinary low water mark;
that in the season of 1882, which was an exceptionally dry
one, the water so far receded that the bottom of the lake at
this point was uncovered, and that, therefore, the point was
above low water mark in exceptionally dry seasons; that
the plaintiff had sowed wild oats and wild rice in that vicin-
ity, upon which fowls, both tame and wild, and the cattle
pasturing upon the adjacent lands fed to some extent.

The referee found that the plaintiff was entitled to recover
of the defendants, if anything, the penalty of ten dollars,
and nominal damages, which he assessed at six cents.

*Dillingham, Huse & Howland* for the defendant Young.

Lake Champlain is a public water, and the title to the
land below low water mark is in the public and is not sub-
ject to private ownership. Gould, s. 203; *Fletcher* v.

*Phelps*, 28 Vt. 262; *Austin* v. *Rutland Rd. Co.*, 45 Vt. 228, 242.

By "low water mark" is meant the ordinary low water mark. Am. and Eng. Enc. Law, 505 and cases cited; *Jones* v. *Parker*, 5 S. E. Rep. 384; *Seaman* v. *Smith*, 24 Ill. 524; *Delaplaine*, v. *G. and N. Ry. Co.*, 42 Wis. 225; *Sloan* v. *Biemiller*, 34 Ohio St. 513.

*H. A. Burt* and *D. G. Furman* for the plaintiff.

"Low water mark" means the lowest point to which the water recedes. *Wood* v. *Kelley*, 30 Me. 47; *Waterman* v. *Johnson*, 13 Pick. 265; *Dutton* v. *Strong*, 1 Black 30; *Stevens* v. *King*, 76 Me. 197.

THOMPSON, J. The plaintiff's land is bounded by the waters of Lake Champlain. Both parties concede that by the law of this state, the plaintiff's land does not extend beyond low water mark. Such is the law of this state. *Fletcher* v. *Phelps*, 28 Vt. 257; *Jakeway* v. *Barrett*, 38 Vt. 316; *Austin* v. *Rutland R. R. Co.*, 45 Vt. 228. The contention is over the meaning of the term "low water mark" as used by the courts and law writers. The plaintiff insists that it means the lowest point to which the water has ever receded. The defendant says that it means *ordinary* low water mark.

By the common law, all that portion of land on tide-waters between high and low water mark, technically known as the shore, originally belonged to the crown, and was held in trust by the King for public uses, and was not subject to private uses without a special patent or grant. *Mayor of Mobile* v. *Slava*, 9 Porter (Ala.) 577; 33 Am. Dec. 325; *Pike* v. *Monroe*, 36 Me. 309; 58 Am. Dec. 751; 3 Kent's Com. (11th Ed.) *427. In Maine the common law was changed by an ordinance of 1641, which declares that proprietors of land adjacent to the tide-waters "shall have pro-

priety to the low water mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further." For the whole article see *Com.* v. *Alger*, 7 Cush. 67. In *Gerish* v. *Propr's of Union Wharf*, 26 Me. 384; 46 Am. Dec. 568, the court was called upon to define the meaning of low water mark as used in that ordinance, and in passing upon the question said:

"It evidently contemplates and refers to a mark which could be readily ascertained and established; and that, to which the tide on its ebb usually flows out, would be of that description. That place, to which the tide might ebb under an extraordinary combination of influences and of favoring winds, a few times during one generation, could not form such a boundary, as would enable the owner of flats to ascertain satisfactorily the extent to which he could build upon them. Much less would other persons, employed in the business of commerce and navigation, be able to ascertain with ease and accuracy, whether they were encroaching upon private rights or not, by sinking a pier or placing a monument. It would seem to be reasonable, that high and low water marks should be ascertained by the same rule. The place to which tides ordinarily flow at high water, becomes thereby a well defined line or mark, which at all times can be ascertained without difficulty. If the title of the owner of the adjoining land were to be regarded as extending, without the aid of the ordinance, to the place to which the lowest neap tides flowed, there would be formed no certain mark or boundary by which its extent could be determined. The result would be the same, if his title were to be limited to the place, to which the highest spring tides might be found to flow. It is still necessary to ascertain his boundary at high water mark in all these places, where the tide ebbs and flows more than one hundred rods for the purpose of ascertaining the extent of his title toward low water mark. It is only by considering the ordinance as having reference to the ordinary high and low water marks, that a line of boundary at low water mark becomes known, which can be satisfactorily proved, and which having been once ascertained will remain permanently established."

Sir Mathew Hale in his treatise *De jure Maris*, c. 4, says
37

"the shore is that ground, that is between the ordinary high and low water mark."   He remarks also :

"It is certain that, that which the sea  overflows, either at high spring tides or at extraordinary low tides, comes not as to this  purpose  under the denomination of *littus maris,* and consequently the King's title is not of  that  large extent, but only to land that is usually overflowed at ordinary tides."

This treatise has been received by judicial tribunals and by distinguished jurists, both during the  earlier and  latter years of the law, with unqualified approbation and commendation.   The authorship of this work has been questioned, but it has often been recognized in this country by the courts and has become a text book.   Houck on Rivers, s. 30.

In *Storer* v. *Freeman,* 6 Mass. 435 ; 4 Am. Dec. 155, it was in effect held that low water mark as applied to the sea shore is ordinary low water mark.

In *Canal Coms.* v. *People,* 5 Wend. 423, cited in Gould on Waters, s. 82, Chancellor Walworth, while holding that the common law rule was applicable to the navigable fresh rivers of New York, said :

"The principle itself  does  not  appear  to be sufficiently broad to embrace our large fresh water lakes, or inland seas, which are  wholly  unprovided  for  by  the  common law of England.   As to these there is neither flow of tide or thread of stream, and  our  local  law  appears to have assigned the shores  down  to  the  *ordinary*  low  water mark to the riparian owners, and the beds of the lakes with the islands therein to the public."

In *Sloan* v. *Bienviller,* 34 Ohio St. 492, low water  mark is defined to be "ordinary low water mark"; and in *Seaman* v. *Smith,* 24 Ill. 521, it is said to be the "line  where  water usually  stands  when  unaffected by any  disturbing cause." The question of  what is meant by low water  mark as a terminus of  boundary  was  discussed  and  passed  upon  in *Stover* v. *Jack,* 60 Pa. St. 339; 100  Am.  Dec. 566, and it was held to be the ordinary low water mark.   While the opinion of  the  court  disclaimed the application of any law

except that of Pennsylvania to the question, the reasoning of the court is very satisfactory. It said :

"To adopt any other rule than low water mark, unaffected by drought, as the limit of title, would carry the rights of riparian owners far beyond boundaries consistent with the interests and policy of the state, and ·would confer title where heretofore none has been supposed. to exist.   *   *   *  Ordinary high water and ordinary low water each has its reasonably well defined marks, so nearly certain that there is not much difficulty in ascertaining it. The ordinary rise and fall of the stream usually finds nearly the same limits. But to bound title by a mark which is set by an extraordinary flood, or an extreme drought, would do injustice, and contravene the common understanding of the people."

These suggestions, as well as the others quoted, apply with great pertinency to the case at bar. Lake Champlain is a public, navigable water. It does not appear that, at any other time in its history, its waters have receded to the point to which they did, in the exceptionally dry season of 1882. We think that upon reason and authority, low water mark as a terminus of boundary, must be held to mean ordinary low water mark. This being so, defendant Young did not enter upon the premises of the plaintiffs, as the referee finds that Young's boat, from which he fired at the ducks passing overhead, at the time of such firing, was at a place in the lake below ordinary low water mark.

To dispose of the case, it is not necessary for us to determine what right, if any, the public has to sail over lands bordering Lake· Champlain between ordinary high and ordinary low water marks, when such lands are covered with water, nor is it necessary to decide in respect to the right of the inhabitants of this state under Ch. 11, s. 40, of our state constitution, in seasonable times, "to hunt and fowl on the lands they hold and on other lands not inclosed," nor in respect to the constitutionality of St. 1884, No. 79, and we do not consider either of these questions.

*Judgment reversed as to defendant Young, and judgment that he recover his costs.*

Tyler, J., being engaged in county court, and Start, J., having been of counsel, did not sit.