H. A. Merrill, et al., Appellants, v. The Board of Supervisors of Cerro Gordo County, Iowa, et al., State of Iowa, Intervener.

**Meandered lakes:** HIGH WATER MARK: EVIDENCE. The high water mark of a lake is coordinate with the limit of the bed of the water, and to the point where the same impresses itself upon the soil sufficiently long and continously as to destroy vegetation and its value for agricultural purposes; and it is impracticable· to determine the high water mark from evidence merely of the height of water in different seasons and in different years.

**Same:** OBSTRUCTIONS TO OUTLET: INJURY FROM OVERFLOW. Where the outlet of a lake is maintained so as to allow the water to pass out in the same way and in the same quantity as it would naturally flow, no recovery can be had for the overflow of land bordering upon the lake; but if artificial changes are made in the outlet so as to raise the level of the water thereby affecting the shore lands there may be a recovery for the resulting injury.

**Same:** DETERMINATION OF NATURAL OUTLET: EVIDENCE. In this proceeding to restrain interference with the flow of water from Clear Lake in this State, the evidence is reviewed and held to show that the natural elevation of the outlet was higher than as determined by the trial court.

*Appeal from Cerro Gordo District Court.*—HON. J. F. CLYDE, Judge.

WEDNESDAY, MARCH 9, 1910.

THE petition alleged the construction of a spillway in the outlet of Clear Lake by the board of supervisors of Cerro Gordo County, and prayed that said board be enjoined from interfering in any way with the outlet or the flow of water through it. A demurrer to the petition was sustained, but plaintiffs were permitted to bring in other parties as defendants by amendment. This was done, and the State of Iowa filed a petition of intervention, alleging the ownership of the bed of the lake, praying like relief, and that it be authorized to erect and maintain a permanent embankment, bulkhead, headgates, and sluiceways for the purpose of retaining the water in the lake at high-water level. An answer was filed, joining issue and praying that all obstructions be removed from the outlet, and that it be safeguarded as nearly as practical as it was in its natural condition. On hearing, decree was entered as appears in the opinion. The plaintiffs appeal.—*Modified and affirmed.*

*Cliggitt, Rule, Keeler & Smith* and *Blythe, Markley, Rule & Smith,* for appellants.

*H. W. Byers,* Attorney-General, *Charles W. Lyon,* Assistant Attorney-General, and *J. E. E. Markley,* for the State.

*Glass & McConlogue, Robert Witwer,* and *Ira W. Jones,* for appellees.

LADD, J.—The township containing Clear Lake was surveyed by the government in 1853. The deputy sur-

veyor, Samuel W. Durham, remarked in his report on many features "calculated to render it curious and interesting, the most prominent of which is the lake, which is a very romantic place." It is described as five miles long, and two miles and ten chains as its greatest breadth, the water as clear and pure, "kept free from miasmatic vapor by the motion of the waves, which whenever the wind blows roll and dash against the shores." Adjacent to the prairie on the south side were said to be curious embankments generally from three to ten feet high and three to ten feet wide, which "contain some large round pebble stone of some tons weight. There is a beach extending most all around the lake, except the south side adjacent to the timber, where the bank is bold, rough, and rocky. The lake heads in a marsh and the precise point of division is undefined. It is said to rise some eighteen inches in the spring, and flows out through the outlet in a current." But according to the field notes the outlet was then dry and "six inches above low-water mark." Settlement had already begun, and several of the pioneers who established their homes on the shores in that and succeeding years testified to the changes wrought since. The locality has become a resort for persons seeking pleasure, recreation, and health, so that while the owners of farms near by or bordering the lake are directly interested in having the water at a low level to avoid overflows, and so that the lands will drain into the lake, the owners of summer cottages on every shore, except at the west end, and others interested in it as a resort, desire that the water be maintained at a high level, thereby the better to foster boating, protect fish and game, and preserve the natural scenic conditions of the lake. Because of this conflict of interests, attention has been directed to the outlet as in a measure controlling the water level, and the only fact necessarily to be ascertained in this suit is the precise elevation of the bottom of the outlet as it was in its natural

condition. Since the original survey, several incidents have occurred which may have affected the volume of the outflow. Thus water was drawn through it into a mill race for many years, operating first a sawmill and then a flourmill, but the last of these was abandoned in 1887. The mayor of the incorporated town of Clear Lake, though utterly without authority, drove pile and put in plank in 1901, and two years later the board of supervisors of Cerro Gordo County, without any better right, constructed a cement spillway in the outlet, with a view of regulating the water level of the entire lake. The pile and plank have disappeared, but a portion of the spillway remains. Originally it was twenty-two feet long, with walls a foot wide, extending three feet below the upper surface of the bottom, which was a foot thick and three feet above, and these were several feet apart. At the west end (toward the lake) were grooves in the walls, and two planks each thirteen inches wide and three inches thick were inserted therein and fastened down by rods. Before this was put in only a little water was seeping through, and there was no channel in the outlet. The bottom of the spillway was placed about a foot below the surface of the outlet, and from that to eighteen inches below the water level of the lake. When completed, water flowed through the way rising above the plank, but shortly afterwards these were, sawed by some unknown person, and later the west end of the spillway was wrecked by dynamite. The bottom of the spillway is somewhat higher at the east end, and the district court decreed:

That the original high-water level of Clear Lake was the level of the easterly end of the bottom of the floor of the spillway constructed by the board of supervisors of Cerro Gordo County, Iowa, about 1905, at or near the original outlet of said lake, to wit, at an elevation of one hundred and eighty-nine and twenty-three hundredths compared with the datum or bench mark at the southeast

corner of Clear Lake Park, established by order of the town council of Clear Lake, Iowa, and the intervener has the right to maintain such embankments, bulkheads, headgates, and sluiceways as may be necessary to maintain the water in said lake at the level hereinbefore stated, and each and every party to this action is hereby perpetually enjoined or restrained from doing or permitting any act or acts that shall raise the water in said lake above the level hereinbefore stated, and the intervener is required, within sixty days after the filing of this memorandum, to remove all stone, earth, and sand that now prevents or hinders the free passage of water from the lake through the said spillway, whenever the water in said lake is above the level fixed herein.

Appellants contend that the natural surface of the bottom of the outlet is from twenty-four to thirty inches above the level fixed by this decree, while the appellees submit that it is shown by the evidence to be "substantially a foot lower in the original natural outlet." They are agreed, however, that the natural outlet, as it was, should be ascertained, and the elevation thereof determined. For sixty years the height of the water in the lake has varied in different years and in the seasons of the same year. One witness estimated the variance between extreme low and extreme high water had been from thirty to forty inches, while others thought it equaled six feet. These changes appear to have been irregular, without fixed quantity or time, except that they have occurred periodically accordingly as the year was wet or dry. Thus the water was high for a few years beginning in 1857, and also for several years commencing in 1878, and more recently from 1905 on. Between these periods were series of years when the water was low. These periodical changes, as well as those occurring in the same season, resulted in overflowing the low lands near to or abutting on the lake at times, and at others the water subsided so as to render them capable of

1. MEANDERED LAKES: high water mark: evidence.

use as meadows and pastures. From such evidence, without proof of the water marks on the soil or their elevation, it is impractical to locate the high-water mark defined as the line which the water impresses on the soil as the limit of its dominion. *Houghton v. Railway*, 47 Iowa, 370. "High-water mark means what its language imports—a water mark. It is co-ordinate with the limit of the bed of the water, and that only is to be considered the bed which the water occupies sufficiently long and continuously to wrest it from vegetation, and destroy its value for agricultural purposes." *Carpenter v. Board*, 56 Minn. 513 (58 N. W. 295). See, also, *Bennett v. National Starch Mfg. Co.*, 103 Iowa, 207; *Park Commissioners v. Taylor*, 133 Iowa, 453. The result attained in ascertaining the elevation of the outlet as nature left it is practically the same. But for evaporation the bottom of it would indicate the low-water mark. This, however, does not fix the water level in the lake, which is largely controlled by evaporation and supply. It may determine the high-water mark by regulating the stream which flows therefrom, and thereby tend to fix the extent to which the bed is filled.

All the parties can ask is that the outlet be not so changed as to allow water to pass in a different way or in larger or smaller quantities than it would were it as nature left it. If that condition is maintained, any injury to either party would present a case of *damnum absque injuria*, while recovery might be had for injuries resulting from the artificial changes affecting the level of the water, and thereby the value of shore lands. 2 Farnham on Waters & Water Rights, section 550. See *In re Minnetonka Lake & Improvement*, 56 Minn. 513 (58 N. W. 295, 45 Am. St. Rep. 494).

2. SAME: obstruction to outlet: injury from overflow.

An examination of the record leaves no doubt but that the ground surface of the outlet as it formerly existed

was considerably above the elevation decreed by the court.

Without reviewing the evidence in detail

3. SAME:
determination
of natural
outlet:
evidence.

that most convincing may be touched. McGowan, who constructed the spillway, testified that after it was completed and the plank inserted, the water was twenty-two inches above the bottom, but that in beginning the work only a little water was leaking through the outlet; that there was no channel, and that in front of the spillway was a natural embankment which held the water back; that on the removal of the plank the water washed this bank out, leaving nothing but stone protruding six or eight inches above the plank in the spillway. A photograph of the scene shows clearly that the spillway was let in the natural surface of the ground at least a foot. True a coffer dam was constructed, but the large stones in front of the spillway were not brought there in making it. The member of the board of supervisors overseeing its construction testified that the west end of the spillway was a foot lower than the level of the lake; that "there was a fill in front of the spillway about to the surface of the lake—that is, about a foot above the floor of the spillway—and there were some large boulders and rocks there," as disclosed in the picture referred to. Stevens, who had owned the land about the outlet since 1858, testified that the outlet had never been changed, and that the "bottom of the spillway is below the natural outlet of the lake." Sarrine, who had lived on the lake shore since 1853, testified that "the bottom of the cement sluiceway put in by the board of supervisors is about a foot lower than the original outlet of the lake." Green testified that there was never any filling at the outlet, that stone had been hauled from in front of the outlet when the lake was low, and that the bottom of the spillway when constructed was about two feet below the water level. Another witness, who was shown to have been familiar with the lake since 1876, testified that he

talked with McGowan when constructing the spillway, and called his attention "to the fact that there was a lot of bank in there, and asked him if they were going to remove it;" that the surface in front of the spillway is now "a foot or more lower than it was when they constructed it;" that such bank appeared to be a natural bank; that on his return a short time after the water was running over one or two planks in the spillway, and, had the bank remained in front, water would not have gone over. But Callanan, who settled there in 1855, testified; "I think the floor of the present spillway is above the original outlet, but I can't say exactly"—and Wood, who reached Clear Lake during the same year, estimated the original outlet to have been a foot below the bottom of the spillway. Another witness testified to hauling stone and dropping them at or near the outlet, and that others had been filling it. Others testified they had seen a person removing sand therefrom, so as to let water into the mill race. Other evidence bore less directly on the issue. The value of such evidence, and especially as to relative conditions at the outlet, necessarily depends upon the accuracy of observation, comparison with other objects, and the like, and it is to be noted that in this respect the witnesses testifying to the elevation of the spillway above the original outlet are at a decided advantage. A separate examination of the record has convinced us that the elevation of the outlet as compared with the datum or bench mark at the southeast corner of Clear Lake Park should have been fixed at 190.23, instead of 189.23, and, as so modified, the decree will be affirmed:—*Modified and affirmed.*

SHERWIN, J., took no part.