SOUTH DAKOTA WILDLIFE FEDERA-
TION, a South Dakota Nonprofit Cor-
poration, and Roger Pries, Appellees,

v.

WATER MANAGEMENT BOARD, State
of South Dakota (# 14760 and #
14820), Appellant.

SOUTH DAKOTA WILDLIFE FEDERA-
TION, a South Dakota Nonprofit Cor-
poration, and Roger Pries, Appellants,

v.

WATER MANAGEMENT BOARD, State
of South Dakota (# 14816), Appellee.

Nos. 14760, 14816, 14820.

Supreme Court of South Dakota.

Argued Sept. 10, 1985.

Decided Jan. 15, 1986.

Thomas E. Klinkel of Richardson, Groseclose, Kornmann, Wyly, Wise & Klinkel, Aberdeen, for South Dakota Wildlife Federation and Roger Pries.

Daniel J. Doyle, Asst. Atty. Gen., Pierre, Mark V. Meierhenry, Atty. Gen., Pierre, on brief, for Water Management Bd.

William E. Coester, Milbank, for amicus curiae, Waubay Lake Ass'n and Sylvester Wika.

HENDERSON, Justice.

## ACTION

This is an appeal from a circuit court judgment which reversed a decision of the South Dakota Water Management Board. The Water Management Board's decision established the ordinary high water mark for Waubay Lake at the elevation of 1,787.0 feet mean sea level. The circuit court's judgment reversed this decision and established the Waubay Lake ordinary high water mark at the elevation of 1,799.3 feet mean sea level. We reverse the circuit court's judgment and hereby reinstate the Board's decision. We also reverse an award of costs and affirm a denial of attorney fees.

## FACTS

By the 1978 enactment of SDCL 43–17–20 through SDCL 43–17–26, inclusive, the South Dakota Water Management Board (Board) was required to establish the ordinary high water mark (OHWM) and the ordinary low water mark (OLWM) for public lakes. The OHWM and the OLWM are respectively defined in SDCL 43–17–20(2) and (3) as follows:

"Ordinary high water mark," the high level reached by the waters of a lake under ordinary and continuous conditions, unaffected by periods of extreme and periodic freshets. The ordinary high water mark is indicated by the continuous presence and action of water which leave a distinct mark either by erosion, destruction of terrestrial vegetation, or some other easily recognized characteristic;

"Ordinary low water mark," the low level reached by the waters of a lake under ordinary conditions unaffected by periods of extreme and continuous drought.[1]

The establishment of the OHWM and the OLWM are important decisions because the adjacent or riparian landowners, own the land down to the OLWM. SDCL 43–17–2. Below the OLWM, the State of South Dakota owns the land and holds it within the public domain. SDCL 43–17–1. However, although the riparian owners own the land down to the OLWM, the public has a right of access for hunting, fishing, boating, and other recreational purposes, up to the OHWM. Thus, the riparian owners cannot restrict or deny the public access to those shore lands and waters below the OHWM on public lakes.

On December 9 and 10, 1982, pursuant to notice to riparian landowners and the pub-

---

1. This statutory language was modified by the enactment of 1985 S.D.Sess.Laws ch. 337, § 2, so that presently, the definitions of "ordinary high water mark" and "ordinary low water mark" are defined in the decisions rendered by the courts of this state.

lic, the Board held hearings in Aberdeen on the establishment of the OHWM for Waubay Lake. Waubay Lake is a series of five interconnected glacier lakes formed by the retreat of the glaciers over 10,000 years ago. Waubay Lake includes North Waubay Lake, South Waubay Lake, Hillebrands Lake, Swan Pond, and Spring Lake. The Lake is located in Day County and lies in a single glacier depression which stretches from a point one mile northeast of Webster to Grenville, South Dakota.

At these Aberdeen hearings, Jerry Steffen (Steffen), an Engineer with the Department of Water and Natural Resources, Division of Water Rights (Division), testified and submitted an investigation report for the Division, which recommended that the Waubay OHWM be set at the elevation of 1,799.3 feet mean sea level (1799.3). Steffen's recommendation, as evidenced by his testimony and report, was based on the elevations of erosion marks, water level, changes in soil characteristics, and outlet structures, along with precipitation records and the hydrological characteristics of Waubay Lake. Several other individuals, however, testified that vegetation, including 60-to-80-year-old cottonwood, elm, ash, and oak trees, exists below the Division's 1799.3 recommendation, as do some public roads. Further testimony was presented which outlined (1) that under the statutes, the OHWM was to be based on ordinary and continuous conditions; (2) that Waubay Lake does not ordinarily reach 1799.3 and has not done so for over 85 years; and (3) that when it did reach 1799.3 in the late 1800's, it was a period of extreme and heavy precipitation. The Board thereupon ordered a continuance so as to obtain more information.

On July 19 and 20, 1983, in Webster, the Board held further hearings on the establishment of the Waubay OHWM. At these hearings, Steffen again testified and also submitted a supplemental investigation and report on behalf of the Division. The rec-

ommendation of the Division in the supplemental report was for an OHWM of 1788. Steffen testified that 1788 was reached as an OHWM because of the conflicting evidence in that major trees—major being 60-to-80 years old and one and one-half feet in diameter—were found to go down to the 1788 level.[2] Further examination of Steffen's testimony reveals the following: (1) A culvert and railroad track exists at 1797.1; (2) a man-maintained outlet exists at 1797; (3) the highest water level reading obtained since 1960 was 1786.5; (4) a 1953 map indicates a water level between 1789 and 1787; (5) an intermittent ridge line exists at this 1789 to 1787 level; (6) when Waubay Lake reached a level of 1799.3 in the late 1800's, the area received almost double the annual precipitation; and (7) his previous recommendation of 1799.3 was based on the shoreline features of erosion and soil characteristics—characteristics similar to other lakes.

John Hatch (Hatch), Chief Engineer of the Division testified concerning the new supplemental recommendation as follows:

[T]he reason for not picking 1799.3 is because we did not believe that is representative of ordinary and continuous water level conditions. We believe that 1788 is, does reflect, more accurately reflects, the actual and ordinary and continuous water level conditions under a high level basis. And that's the real question on Waubay Lakes where you do have conflicting evidence of the role of the obvious water mark of 1799 as to what is ordinary and continuous and I do not see where you call 1799 ordinary and continuous when the water level has not been that high since 1897. And that is the reason the lower level, 1788, is being recommended.

Jack Opitz (Opitz), Supervisor of the Department of Game, Fish and Parks in Watertown also testified. He recommended that the OHWM be set at 1799.3. His testimony, in substance, was that the high-

2. *See* photographs appended to dissent. Obviously, these cottonwood trees would not have grown, for they would be under water per the

theory of the circuit court which theory is adopted by the dissent.

est water mark evidenced on shore was to be used even if that mark has not been reached in many years.

Roger Pries (Pries), Executive Director of the South Dakota Wildlife Federation (Federation), also testified. Pries and the Federation are parties to this appeal and will be collectively referred to as the Federation. The Federation asserted the adoption of 1799 as the OHWM for Waubay Lake. The Federation's rationale for such an adoption was, in substance, public policy, public rights, consistency, and the relative length of time in a lake's lifespan. The Federation admitted, however, that Waubay Lake presented a special situation.

After receiving all the testimony, the Board conducted an on-site examination of Waubay Lake.[3] Thereafter, and based on the examination and the testimony and evidence presented, the Board set the OHWM for Waubay Lake at the elevation of 1,787 feet mean sea level. From the Board's determination, the Federation appealed to the circuit court. On April 25, 1984, pursuant to a circuit court order, the Board conducted a supplementary hearing in Pierre on the Waubay Lake OHWM. During this supplemental hearing, Steffen again testified. Steffen testified that he believed the original Division recommendation of 1799.3 was correct; that the supplemental recommendation of 1788 departed from erosion and soil change characteristics and relied on established trees in the lake bed and disregarded the main high water mark characteristics of the lake. Steffen also testified, however, that 1799.3 was the extreme high water mark; 1799.3 was reached in the late 1800's during several years of 42-inch precipitation; records show a level of 1799.3 being reached only once; four or five residences in Grenville are built below the 1799 level; there has not been a case where the water level was so different from his OHWM recommendation; there has not been a case where there were 60-to-80-year-old trees eleven feet below his OHWM recommendation; and that

the Board has ignored the Division's recommendations in the past. The Board, thereafter, reaffirmed its prior decision and set the Waubay Lake OHWM at the elevation of 1,787 feet mean sea level.

The circuit court, however, after receiving briefs and oral arguments from the parties, and after its own on-site examination of Waubay Lake, reversed the Board's decision and set the OHWM at the elevation of 1,799.3 feet mean sea level. The circuit court concluded that the Board's decision: (1) violated the public trust; (2) erred as a matter of law; (3) was clearly erroneous in light of the entire evidence; and (4) was arbitrary, capricious, and characterized by an abuse of discretion. The circuit court also awarded the Federation certain costs but denied their request for attorney fees. From the determination setting the Waubay OHWM at 1799.3 and the taxation of costs, the Board now appeals. From the denial of attorney fees, the Federation appeals.

DECISION

I.

WAS THE BOARD'S DETERMINATION ESTABLISHING THE OHWM AT 1787 ERRONEOUS? WE HOLD THAT IT WAS NOT.

This Court reviews the administrative decision essentially in the same manner as did the circuit court. *Matter of South Dakota Water Management Bd.*, 351 N.W.2d 119, 122 (S.D.1984).

Thus, our review is of the decision of the administrative agency and our standard is the clearly erroneous standard. If the circuit court reversed the agency's decision, and "[i]f after review of the evidence we deem the agency findings clearly erroneous, we affirm the circuit court. If the agency findings are not clearly erroneous, then the circuit court was clearly erroneous in so concluding." *State, Div. of Human Rights v. Miller*, 349 N.W.2d 42, 46 n. 2 (S.D.1984).

3. When establishing a lake's OHWM and OLWM, the Board, or its designated representa-

tive, is required by SDCL 43–17–24, inter alia, to physically investigate the site.

*Kienast v. Sioux Valley Co-op,* 371 N.W.2d 337, 339 (S.D.1985). *See also, Stavig v. South Dakota Highway Patrol,* 371 N.W.2d 166, 168 (S.D.1985).

As stated in the facts above, the adjacent, riparian, or upland owner takes to the edge of public lakes at the ordinary *low* water mark. *See* SDCL 43–17–2; *Anderson v. Ray,* 37 S.D. 17, 24, 156 N.W. 591, 593 (1916); *Flisrand v. Madson,* 35 S.D. 457, 470, 152 N.W. 796, 801 (1915). The riparian owner's title, however, is absolute only to the extent of the O*H*WM. As to the intervening shore between the ordinary high and the ordinary low water marks, the riparian owner's title is qualified or limited by and subject to the public's right of access and use for navigating, boating, fishing, fowling, and like public purposes. *Flisrand,* 152 N.W. at 801. *See also, State ex rel. Clark v. Deisch,* 38 S.D. 560, 564, 162 N.W. 365, 366 (1917). Thus, the riparian owner may not interfere with or prevent the public's use or lawful access. The State of South Dakota, on the other hand, owns the bed of the lake or that portion below the low water mark.[4] *Hillebrand v. Knapp,* 65 S.D. 414, 418, 274 N.W. 821, 822 (1937).

The OHWM was defined in SDCL 43–17–20(2), at the time of the events at bar, as

> the high level reached by the waters of a lake under ordinary and continuous conditions, unaffected by periods of extreme and periodic freshets. The ordinary high water mark is indicated by the continuous presence and action of water which leave a distinct mark either by erosion, destruction of terrestrial vegetation, or some other easily recognized characteristic[.]

This statute is a combination of our holdings in *Flisrand* and *Anderson.* However, as this Court stated in *Flisrand,* 35 S.D. at 470, 152 N.W. at 800–01:

**4.** This does "not mean that the state is the proprietary owner in the sense that the state might sell or otherwise dispose of the same to private individuals for private ends, but that the state

Neither high nor low water mark means the highest or lowest point reached by the waters of a lake during periods of extreme and continued freshets, or periods of extreme and continued drought, but does mean the high and low points of variation of such waters under ordinary conditions, unaffected by either extreme. Farnham on Water Rights, p. 1461; *Carpenter v. Board of Commissioners,* 56 Minn. 513, 58 N.W. 295; *Dow v. Electric Co.,* 69 N.H. 498, 45 Atl. 350, 76 Am.St. Rep. 189; *Stover v. Jack,* 60 Pa. 339, 100 Am.Dec. 566; *McBurney v. Young,* 67 Vt. 574, 32 Atl. 492, 29 L.R.A. 539.

The OHWM thus does not encompass the peak flow or flood stages. *Buttrey v. United States,* 573 F.Supp. 283, 298 (E.D. La.1983).

In *Anderson,* 37 S.D. at 25–26, 156 N.W. at 594, this Court quoted with approval language in *Carpenter v. Bd. of Comm'rs,* 56 Minn. 513, 518, 58 N.W. 295, 297 (1894), wherein the Minnesota Supreme Court said:

> [I]n the case of fresh-water rivers and lakes—in which there is no ebb and flow of the tide, but which are subject to irregular and occasional changes of height, without fixed quantity or time, except that they are periodical, recurring with the wet or dry seasons of the year—high-water mark, as a line between the riparian owner and the public, is to be determined by examining the bed and banks, and ascertaining where the presence and action of the water are so common and usual, and so long-continued in all ordinary years, as to mark upon the soil of the bed a character distinct from that of the banks, in respect to vegetation, as well as respects the nature of the soil itself. "High-water mark" means what its language imports—a water mark. *It is co-ordinate with the limit of the bed of the water; and that, only, is to be considered the bed which the water occupies sufficiently long and*

holds the title to such lake bed in trust for the benefit of the public." *Flisrand,* 35 S.D. at 470, 152 N.W. at 800.

continuously to wrest it from vegetation, and destroy its value for agricultural purposes. *Ordinarily,* the slope of the bank and the character of its soil are such that the water impresses a distinct character on the soil, *as well as on the vegetation.* In some places, however, where the banks are low and flat, the water does not impress on the soil any well-defined line of demarkation between the bed and the banks. In such cases, *the effect of the water upon vegetation must be the principal test in determining the location of high-water mark,* as a line between the riparian owner and the public. It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation.... (Emphasis supplied.)

*See also, Merrill v. Bd. of Supervisors of Cerro Gordo County,* 146 Iowa 325, 328, 125 N.W. 222, 224 (1910); *Ephraim Creek Coal & Coke Co. v. Bragg,* 75 W.Va. 70, 73, 83 S.E. 190, 191 (1914). "The value for agricultural purposes is destroyed where terrestrial plants not all plant life ceases to grow." *Borough of Ford City v. United States,* 345 F.2d 645, 648 (3rd Cir.1965), *cert. denied,* 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156 (1965).

■ Thus, under ordinary circumstances, the OHWM will be set at the level where there is a distinct mark which evidences erosion, *and* changes in the character of the soil, *and* destruction of terrestrial vegetation, which have occurred under the *ordinary* and *continuous* conditions of the lake, disregarding periods of extreme and periodic freshets, and disregarding the highest water mark which does not evidence erosion *and* soil changes *and* destruction of vegetation occasioned under ordinary conditions. If a single distinct mark, occasioned under ordinary circumstances and evidencing all of the factors delineated above does not exist, i.e., there is conflicting evidence of the role of the

OHWM, it is the level where significant, major, and substantial terrestrial vegetation ends, that the OHWM is to be set. *See Borough of Ford City,* 345 F.2d at 648; *State, Dep't of Natural Resources v. Pankratz,* 538 P.2d 984, 989 (Alaska 1975); *Hayes v. State,* 254 Ark. 680, 684, 496 S.W.2d 372, 374–75 (1973); *Tilden v. Smith,* 94 Fla. 502, 513, 113 So. 708, 712 (1927); *Carpenter v. Bd. of Comm'rs,* 58 N.W. at 297; *Rutten v. State,* 93 N.W.2d 796, 799 (N.D.1958); *Anderson v. Ray,* 156 N.W. at 594; and *Ephraim Creek Coal & Coke Co. v. Bragg,* 83 S.E. at 191.

■ In the present case, conflicting evidence was presented as to the Waubay OHWM. Erosion and soil changes existed at the 1799.3 level but the soils below 1799.3 are usable for agricultural purposes and the water level reached this point in the late 1800's during a period of heavy rain and snowfall. The lake has not reached that level since that time and roads, houses, and significant and substantial terrestrial vegetation exist below the 1799.3 level. Thus, the mark at the 1799.3 does not encompass all three relevant factors and it was not the result of ordinary conditions at Waubay Lake. The Board appropriately established the Waubay Lake OHWM at the elevation of 1,787 feet mean sea level—the level where significant and substantial terrestrial vegetation ends.[5] The Board's decision was not clearly erroneous, arbitrary, an abuse of discretion, or in error as a matter of law. The circuit court's judgment reversing the Board is therefore reversed and the Board's decision reinstated.

## II.

IS THE PUBLIC TRUST DOCTRINE APPLICABLE TO THE ESTABLISHMENT OF THE OHWM? WE HOLD THAT IT IS NOT.

As stated above, the State of South Dakota "holds title to the bed of [Waubay Lake] not in a proprietary capacity, but in

---

**5.** The 1,787 OHWM is also consistent with an intermittent ridge line; the highest water level

reading since 1960; and the water level indicated by a 1953 map.

trust for the people that they may enjoy the use of [its] navigable waters for fishing, boating, and other public purposes freed of interference of private parties." *Hillebrand*, 65 S.D. at 418, 274 N.W. at 822–23. The riparian owner, however, owns down to the O*L*WM, but the public has a right of access up to the O*H*WM. The Federation contends that because the Waubay Lake OHWM was at 1799.3 when South Dakota entered the Union, an OHWM lower than 1799.3 cannot now be set without violating the trust under which the state holds the bed of Waubay Lake. For the reasons outlined below, we find the public trust doctrine inapplicable to the establishment of the OHWM.

 First, the OHWM is established by the processes of nature and the Board's setting thereof is merely a formal recognition of the mark established by nature. The riparian owner has title to relictions or accretions to his land, *Hillebrand, id.*, and the trust held by the state, and the public's right of access does not apply "to lakes, which at some former time might have been public or navigable, but which have been by some natural cause permanently and forever changed in character, so that the public could no longer reasonably claim to use the same for such public purpose." *Flisrand*, 35 S.D. at 471, 152 N.W. at 801. Thus, the public trust is subject to changes in the character of a lake, and this includes a lowering of the OHWM.

Second, even assuming the Federation's contention to be valid, there is insufficient evidence in the record to clearly establish that Waubay Lake was at 1799.3 when South Dakota entered the Union in the year 1889. The Federation's contentions on this issue are not sustainable.

 We have examined the other contentions raised herein and find them to be without merit. The Federation is not entitled to attorney fees nor the costs awarded below.

The circuit court judgment appealed by the Board is reversed and the Board's decision is reinstated. The circuit court judg-

ment which awarded the Federation costs, is also reversed, and the same circuit court judgment which denied the Federation recovery of attorney fees is affirmed.

MORGAN, J., and HERTZ, Circuit Judge, Acting as Supreme Court Justice, concur.

FOSHEIM, C.J., and WUEST, J., dissent.

WUEST, Justice (dissenting).

I would affirm the trial court. The proper scope of review in a case such as this, when the issue is a question of law, is that the decisions of the administrative agency and the circuit court are fully reviewable. *Johnson v. Skelly Oil Co.*, 359 N.W.2d 130 (S.D.1984); *see also Matter of Change of Bed Category of Tieszen*, 343 N.W.2d 97 (S.D.1984); *Nash Finch Co. v. South Dakota Dept. of Rev.*, 312 N.W.2d 470 (S.D. 1981). When the issue is a question of fact, however, we ascertain whether the administrative agency was clearly erroneous. *Matter of S.D. Water Mgmt. Bd.*, 351 N.W.2d 119 (S.D.1984); *State, Div. of Human Rights v. Miller*, 349 N.W.2d 42 (S.D. 1984). This dissent is based on: (1) a misapplication of the law; and (2) the fact that Board's decision was clearly erroneous under the facts.

In my opinion, the South Dakota Water Management Board (Board) did not follow the legal definition of an ordinary high water mark (OHWM). SDCL 43–17–20(2) provides:

(2) 'Ordinary high water mark,' the high level reached by the waters of a lake under ordinary and continuous conditions, unaffected by periods of extreme and periodic freshets. The ordinary high water mark is indicated by the continuous presence and action of water which leave a *distinct mark* either by erosion, destruction of terrestrial vegetation, or some other *easily recognized characteristic.* (Emphasis added.)

None of the elements required under this statutory definition are found at the elevation of 1787 chosen by Board. The statu-

tory definition leaves no doubt that there must be a *distinct mark* before Board can say that it has set an OHWM. Secondarily, they must have evidence which indicates this distinct mark by one or more of three methods: (1) erosion lines, (2) destruction of terrestrial vegetation, or (3) some other easily recognized characteristic. Board's decision fails to meet any of these statutory elements.

SDCL 43–17–23 further mandates that natural factors take precedence in determining an OHWM. Influences caused or created by human beings are to be disregarded unless they have lawfully existed for such a period of time that they could be deemed the equivalent of natural conditions.

While the codified definition of an OHWM is generally consistent with previous South Dakota Supreme Court decisions and federal case law, the statutory language itself is obviously controlling. The OHWM concept originated in English common law several centuries ago. *See, generally, Flisrand v. Madson, et al.,* 35 S.D. 457, 152 N.W. 796 (1915); *Anderson v. Ray,* 37 S.D. 17, 156 N.W. 591 (1916).

Both South Dakota statute and case law require the existence of an actual, physical mark as a *sine qua non* in establishing an OHWM. SDCL 43–17–20(2) by its very terms requires *a distinct mark*, which it goes on to describe as an *easily recognized characteristic.* This is consistent with the early, definitive opinion of this court in *Anderson, supra:* " 'High-water mark' means what its language imports—a water mark." 37 S.D. at 25, 156 N.W. at 594. Thus, Board misinterpreted the definition of an OHWM as a matter of law, for it has not set the mark where there is a *distinct mark that is easily recognized.* The attached exhibit consists of two photographs. The legend of Photo No. 2 in the lower right corner clearly depicts the *distinct mark* that is easily recognized. This is but one of several photographs depicting this *distinct mark* near the same elevation.

Not once did Board contend there was any kind of a distinct mark at elevation 1787. There are no findings of fact to that effect, nor is there any analysis in Board's brief that would claim that a distinct mark is present at 1787.

The undisputed evidence in this case establishes that Waubay lakes constitute a single watershed essentially unchanged since their glacial origin 10,000 years ago. The best evidence available indicates that when South Dakota entered the Union in 1889, Waubay lakes were "full" at the elevation of 1799.3. Since that time, two outlet structures, both man made, were built at elevations of 1798.2 and 1797.0. Obviously, the lakes cannot reach the elevation of 1799.3 while these man-made outlet structures remain. If man-made outlets can be a determining factor, the high water mark could be anything above the lake bed.

The primary field work and on-site investigation to determine the physical evidence of the OHWM for Waubay lakes was conducted in 1982 by Natural Resources Engineer Jerry E. Steffen (Steffen), an experienced, professional member of Board's staff, who has conducted numerous other similar investigations for Board. His study formed the basis of the original official recommendation to Board on this particular matter.

Mr. Steffen generally selected and studied shoreline areas, which were the least affected by human contact. The specific purpose of his investigation was to "ascertain where the continuous presence and action of water has left a distinct mark; either by erosion, destruction of terrestrial vegetation, or some other easily recognized characteristic." As part of his investigation, he considered the size of the watershed area, the precise nature of the watershed, the topography, soils, and general characteristics of the lakes. The physical evidence he found led him to the ultimate conclusion that the OHWM for Waubay lakes was at elevation 1799.3.

One of the primary indicators Steffen observed and analyzed was the presence and location of erosion lines. Erosion lines left by the presence and action of water are characterized by changes in soil material

and by an actual change in the slope of the ground. The presence and action of water separates the smaller clay and silt particles from the sands and gravels and also modifies the slope of the ground, thereby creating an observable line between the bed and banks of a lake. Steffen found the erosion lines to be the single most consistent objective, physical indicator of the OHWM on Waubay lakes.

Easily recognized and definable erosion lines were found between the elevations of 1798.4 and 1800.6, with the vast majority occurring precisely at 1799.3. No contradictory evidence on this point was ever presented. Even the 1983 Supplemental Report refers specifically to the very obvious high water mark found at elevation 1799.3 and indicates that it is a mark denoted by "continuous erosion marks," well-defined beach scarps (a steep slope above 1799.3), ridges (an elongated elevation below 1799.3), bounder lines, and significant changes in soil characteristics.

The dramatic change in soil characteristics also heavily supports the obvious high water mark found only at 1799.3. The 1799.3 elevation precisely and dramatically divides highly different soils. Above 1799.-3, First-Class Soils, particularly well suited for good, tillable farm land, predominate. Below elevation 1799.3, Third-Class Soils, not at all suited for intensive cultivation, are found. These latter soils consist of Type 16, known as Foxhome sandy loan, a soil which is developed in gravelly and stony water-washed glacial till and is periodically flooded. Type 21, Maple Silty clay loan, is a soil with a very high soluble salt content.

Another physical indicator observed by both Steffen and Chief Engineer John Hatch (Hatch) was a clear-cut relationship between the high water mark elevation of 1799.3 and the two man-made outlet elevations of 1797.0 and 1798.2. The specific conclusion drawn was that throughout the 10,000-year history of Waubay lakes, the presence and action of water has reached the elevation of 1799.3 so often that it has produced drastic changes in the land up to that elevation. (Man-made influences, such as these outlets, are to be disregarded in establishing the OHWM. SDCL 43–17–23.)

Trees and other terrestrial vegetation showed several patterns. Older oak trees are found only above the high water mark found at 1799. There are established lines of eighty-year-old trees found at elevations 1797 down to 1796. Between 1796 and 1788 there is random tree growth with no clearly established lines. Very small trees and shrubs are found below elevation 1787. Board and the majority opinion rely upon the existence of the eighty-year-old trees to buttress their decision, however, one should note that the man-made outlets at 1797.0 and 1798.2 would effectively eliminate a water level above 1797.0; and, thus, the highest elevation at which a tree line could occur after these structures were built would be 1797.0.

The final additional, physical characteristic studied and presented at the hearings concerned the actual levels of one or more of the five interconnected lakes at issue. The only actual water levels systematically recorded were those begun by the staff of the Waubay National Wildlife Refuge in 1960. There are only sketchy reports between 1890 and 1960. Precipitation amounts were recorded for the cities of Webster and Sisseton, both of which are nearby; but outside the actual watershed of Waubay lakes. The actual watershed reaches from a point one mile northeast of Webster to Grenville in Day County, a distance of about ten miles.

Finally, Steffen found the remains of the original trails used by the first white settlers in the area, which would have been made a few years before South Dakota's entry into the Union. These trails follow the OHWM of 1799.3 recommended by Steffen in his 1982 report and show that they did not go below that mark with their trails in that era.

Engineer Steffen recommended that the OHWM of Waubay lakes be set at 1799.3, based on erosion mark elevations, the outlet structure elevation, water level elevations, precipitation records, and the actual

hydrological characteristics of the entire watershed area for Waubay lakes. Board's staff, including Engineer Hatch, concurred fully with that report. Nevertheless, at the conclusion of the December 1982 hearing, it was apparent to Division that Board, in the face of emotional, heated opposition from a number of private individuals, was not inclined to accept that level. Hatch requested that Board provide direction on where it wanted Its staff to go before the continuation of the hearings in 1983.

Although Steffen presented the supplemental report at the July 1983 meeting, he did not agree with this new report signed by Hatch. Steffen reminded Board of the obvious characteristics pointing to a high water mark of 1799.3. He also reminded Board that his 1982 report was based on the 10,000-year history of Waubay lakes. At the April 25, 1984, hearing, Steffen testified that Hatch had found nothing wrong with his original report until the close of the 1982 hearings. After that 1982 hearing, he was directed by Hatch to go out and find evidence below the 1799.3 level. Steffen unequivocally testified that he did not agree with the conclusion contained in the supplemental report and still categorically agreed with his original recommendation of 1799.3. Hatch, the author of the supplemental report, never testified at any of the hearings on this matter.

Steffen has been the engineer involved in all of the prior OHWM determinations of Board except one.

I am authorized to state that Chief Justice FOSHEIM joins in this dissent.

## APPENDIX B

## PHOTOS OF TREES GROWING BELOW THE OHWM

PHOTO NO. 1.
Description: Cottonwood, Dia 2.4'
Age 75 Years
Base Elevations: Lakeside ......1788.3
Landside ......1788.9

PHOTO NO. 2
 Description: Cottonwood, Dia 2.0'
 Age 60 Years
 Base Elevations: Lakeside ......1789.4
 Landside ......1789.6

 Erosion Marks: Upper level of
 exposed rocks are between
 elevations of 1799.3 and
 1798.4